**EVANS PRODUCTS COMPANY, a Corporation, Plaintiff,**

v.

**VENEERS, INC., a Corporation, Defendant.**

**No. 70 C 420(3).**

United States District Court, E. D. Missouri, E. D.

Sept. 23, 1971.

Kramer, Chused & Kramer, St. Louis, Mo., for plaintiff.

Merle L. Silverstein, Rosenblum & Goldenhersh, Clayton, Mo., for defendant.

## MEMORANDUM

WEBSTER, District Judge.

In this action, plaintiff, a Delaware corporation having its principal place of business in Chesapeake, Virginia, seeks to recover from defendant, a Missouri corporation having its principal place of business in St. Louis, Missouri, for goods, wares and merchandise sold and delivered by plaintiff to defendant. By counterclaim, defendant seeks to recover for missing and below-grade items in connection with such sales and deliveries. The amount in controversy exceeds $10,000 and this court has jurisdiction under 28 U.S.C. § 1332.

Defendant has been engaged in the wholesale distribution of building products since 1949. Its office is located at 4451 Duncan Avenue, St. Louis, Missouri. It has a loading dock and a railroad siding. Defendant also operates a discount store at 7587 Olive Street Road in St. Louis County, Missouri, where it sells prefinished plywood paneling. Plaintiff, through its related' divisions and subsidiaries, manufactures and sells plywood paneling, among other products. Plaintiff has sold plywood paneling to defendant since the mid-1950's on an open and running account. The books and records of plaintiff reflect that there is due and owing from defendant the sum of $11,331.03, the amount of the prayer, and the court so finds.

The dispute centers upon certain shipments made in December, 1969 and certain claims for credits advanced by defendant in its counterclaim based upon purchases made in prior years.

Sam Berg, owner and president of defendant, testified that when paneling arrived at the loading dock, the paneling was packaged or crated, and that it was not possible to make an immediate inventory to determine whether any sheets were missing or whether the product was as ordered, or was defective or of lower grade. Whenever he was advised of a defect or shortage, he personally inspected the shipment and would notify the district representative of plaintiff by telephone. The shipment was then kept intact until plaintiff's representative had had an opportunity to inspect. Mr. Berg segregated the invoice on a contested shipment in a separate file. The invoice generally arrived within one week of delivery of the shipment. When plaintiff would issue a credit memorandum on the open and running account, the invoice would be returned to defendant's accounting department and entries made and filed.

Defendant's Second Counterclaim asserts numerous claims for credit and

damages resulting from alleged defective products or incorrect billing for products received. In this connection, Mr. Berg testified that on occasion he received paneling of a grade below the quality which he had ordered and for which he was billed. There was considerable testimony to substantiate that defendant did in fact contend for credit allowances over the years and that on numerous occasions such credits were given against its open and running account with plaintiff. It also appears that in negotiations with William Viau, former district sales manager of plaintiff, Mr. Viau offered defendant other forms of allowances, apparently in order not to diminish the sales performance for which he was responsible. Robert M. Blood, credit manager of plaintiff, testified that when he became responsible for policing defendant's account, he made a serious effort to obtain authority to have the plaintiff's representatives settle the disputed items which had been allowed to drift. Defendant, whether in order to bring the matter to a head or due to an inability to pay, had allowed its balance due per plaintiff's books to reach $50,095.71 as of June 30, 1968. On July 7, 1968, plaintiff paid $5,673.26 leaving a balance of $44,422.45. Again in July, Mr. Blood talked to Mr. Berg with reference to defendant's balance on the ledger and attempted to collect the full account. He was told that the account would be settled when Mr. Berg's complaints had been handled. Mr. Viau obtained approval to authorize a total credit of $7,-628.26 to settle the disputed items with defendant. Credit was issued August 15, 1968. Subsequently, on September 19, 1968 plaintiff received a $30,000 payment from defendant and on October 10, 1968 plaintiff received a payment of $5,976.87. (These payments were clearly "on account" and not in payment of any specific invoice.)

A discussion between Blood and Berg preceded the $5,976.87 payment. Blood was told by Berg that there was yet one more claim in the amount of $615.96. Blood agreed with Berg that defendant should send in the amount of the balance due less the claimed credit and this would clear the balance due. The remittance advice which accompanied defendant's check for $5,976.89 reflected a a balance due of $6,592.83 less a claimed credit of $615.96, or $5,976.87. The difference between the amount conceded as due by defendant, $6,592.83, and the balance shown on plaintiff's ledger sheet of $6,652.81, or $59.98 represented an unearned discount claimed by defendant and until that point not allowed by plaintiff. Plaintiff then wrote off the unearned discount of $59.98 previously taken by defendant and this resulted in a zero balance. (The credits of $615.96 and $59.98 were not posted until December 31, 1968 and January 6, 1969 respectively.) The court finds the testimony of Robert M. Blood with respect to the settlement arrangement and agreement with Mr. Berg to be credible and Mr. Berg, although present in the courtroom, did not retake the stand to dispute Blood's testimony. The court finds that there was sufficient evidence from which the court may and does find and conclude that the August 15, 1968 credits aggregating $7,628.26 and the subsequent credits of $615.96 and $59.98 were collectively given and received in full satisfaction of all claims of defendant relating to its account with plaintiff prior to October 10, 1968. Accordingly, the court finds for plaintiff and against defendant on defendant's Second Counterclaim.

Defendant's first Counterclaim relates to alleged shortages contained in invoice # 1118020 dated December 5, 1968 and covering a December 3, 1968 shipment. The shortages are set forth as items 87, 88 and 89 in Defendant's Exhibit A in the amounts of $148.-80, $206.08 and $824.32 respectively for a total of $1,179.20. The court finds and concludes from the credible evidence that these shortages in fact existed and were reported in the manner established by practice between plaintiff and defendant over the years. Accordingly, defendant is entitled to recover on its

first Counterclaim in the amount of $1,179.20 which will be treated as a set-off against plaintiff's claim. Other allegations of loss due to replacement of missing panels, freight charges and telephone calls in connection therewith are unsupported by the evidence adduced at trial. Further, these items are normally not recoverable unless time has been made the essence of the contract and the seller is unable to complete the order, an element likewise not established by the weight of the credible evidence.

Plaintiff is therefore entitled to recover from defendant the sum of $11,-331.03 diminished by the amount of $1,179.20 found to be due under defendant's first Counterclaim, or $10,151.83. As previously stated, plaintiff is entitled to judgment on defendant's Second Counterclaim.

The foregoing Memorandum constitutes the court's findings of fact and conclusions of law. The clerk will enter judgment accordingly.