### FIRE SPRINKLER FABRICATORS CORPORATION, Plaintiff,

v.

### BERT'S REFRIGERATION, INC., Defendant.

#### No. 86–1760C(3).

United States District Court, E.D. Missouri, E.D.

June 28, 1988.

---

David Freyman, Newman, Goldfarb, Freyman & Stevens, Clayton, Mo., for plaintiff.

David L. Welsh, Don R. Wintermeyer, St. Louis, Mo., for defendant.

## MEMORANDUM

HUNGATE, District Judge.

This matter is before the Court to determine the merits of plaintiff's claim against defendant, and defendant's counterclaim against plaintiff, after a one-day nonjury trial.

Plaintiff brings this action pursuant to 28 U.S.C. § 1332 to recover on account for materials and equipment used to install a fire sprinkler system sold to defendant. Plaintiff also seeks interest and court costs. In its answer, defendant argues it is entitled to a set-off on the grounds that

(a) plaintiff failed to deliver the goods within the time agreed upon between plaintiff and defendant and within a reasonable time, thereby causing delay and expense to defendant's work on the project for which these goods were ordered, and further required defendant to purchase extra and additional materials and supplies in order for defendant to perform the work;

(b) the goods as sold and delivered to defendant were defective and not fit or suitable for their intended use and purpose, which intended use and purpose were known to plaintiff; that as a direct and proximate result thereof, defendant was required to return these goods to plaintiff

who replaced them with substitute goods which also were not fit for their intended use and purpose because of damage caused by installation of the defective original materials; and

(c) plaintiff has billed and charged, and not given defendant credit for goods which were never delivered to defendant in accordance with defendant's purchase order for these goods, and defendant was required to obtain these goods elsewhere at defendant's cost and expense.

Defendant argues points (a) and (b) in its counterclaim and requests judgment against plaintiff in the amount of $30,000.00, plus interest and costs.

Having carefully considered the pleadings, testimony, stipulation, evidence, and the entire record herein, the Court hereby makes and enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Fire Sprinkler Fabricators Corporation, is a Kansas corporation with its principal place of business in Wyandotte County, Kansas, and is licensed to do business in Missouri.

2. Defendant, Bert's Refrigeration, Inc., is a Missouri corporation with its principal place of business in St. Louis County, Missouri.

3. Plaintiff sells components, material, hardware, and equipment used in fire sprinkler systems.

4. Defendant, also formerly known as Gateway Fire Sprinkler, is a mechanical, electrical, plumbing, and fire sprinkler system contractor.

5. On June 7, 1985, plaintiff and defendant entered into an agreement whereby plaintiff agreed to sell and defendant agreed to buy various materials and equipment for the installation of a fire sprinkler system at 3801 McKelvey Road, Bridgeton, Missouri. The contract price was $62,500.00 exclusive of freight charges. Bert Schonlau, president of defendant, testified that $62,500.00 was a reasonable price for the materials and equipment.

6. At the time of the agreement between plaintiff and defendant, the Kroger Company was leasing a warehouse at 3801 McKelvey Road. As part of the lease conditions, Kroger required that the warehouse, specifically the freezer and office areas, have sprinkler fire protection.

7. In a purchase order dated May 21, 1985, handwritten by Mr. Schonlau, all materials were to be shipped from plaintiff by June 20, 1985, the completion date. In a formal letter dated June 20, 1985, from defendant to plaintiff, the completion date of plaintiff is stated to be June 28, 1985. Although a discrepancy exists regarding the completion date, the Court finds June 28, 1985, to be the completion date as reflected in the formal follow-up letter to plaintiff.

8. Initially, the Kroger Company requested defendant have the fire sprinkler system completely installed and ready for inspection by the end of July or the first of August. However, Kroger changed defendant's completion date to September 1, 1985, because some additional work on the warehouse was being done for Kroger.

9. An invoice dated June 20, 1985, for the contract price of $62,500.00, was sent to defendant. The invoice indicated that freight charges were to be billed later. The balance on the bill was due on July 20, 1985. A stamp appeared on the invoice stating that "a service of 1½% per month on any part thereof will be charged on all invoices that are past due." However, there is no agreement in writing that defendant agreed to pay the 1½% per month interest.

10. Plaintiff delivered some of the equipment and material for the fire sprinkler system, including piping and fittings, by June 28, 1985. The material and equipment not delivered were Viking Valve Company equipment, valves, other fittings, air compressors, and equipment for the apparatus room.

11. After June 28, 1985, Glen Sanders, an employee of plaintiff, made numerous reassurances to defendant that the equipment and materials would be shipped.

12. Plaintiff's invoices dated in July indicated that additional material was sent to defendant not provided in the original contract in the total amount of $481.81. In addition, shipping charges for all materials and equipment shipped totalled $1,016.57.

13. In August, Mr. Schonlau contacted a representative at Viking Valve Company and Glen Sanders concerning plaintiff's failure to complete delivery of all materials and equipment by the completion date of June 28, 1985. As a result of the conversations, Mr. Schonlau and the subcontractor were instructed to buy the needed materials and equipment on the open market.

14. Mr. Schonlau testified that the following items were not delivered by plaintiff to defendant, but were required by the contract: (a) two air compressors in the amount of $974.85 each, for a total amount of $1,949.70 (an air compressor was shipped to defendant but was the wrong size so it was shipped back to plaintiff); (b) a Deltech heatless dryer and an Asco water valve in the total amount of $432.32; and (c) an LPS–20 Deltech heatless dryer in the amount of $1,872.25. Mr. Schonlau further testified that extra material and labor, in the amounts of $1,017.74 and $703.12, were supplied by Automatic Fire Control Systems, Inc., the subcontractor performing the installation, because of plaintiff's failure to provide such material. A total amount of $5,975.13 for material and labor used to install equipment not provided by plaintiff was incurred by defendant.

Plaintiff concedes that one of the air compressors in the amount of $974.85, and the $1,017.74 for material and equipment supplied by Automatic Fire Control Systems, Inc., should be offset against the total amount requested by plaintiff.

15. Mr. Schonlau testified that defendant had paid Automatic Fire Control Systems, Inc., the amounts of $1,017.74 and $703.12 for extra material and labor provided to defendant. However, the amount of $1,017.74 has not been paid to Automatic Fire Control Systems, Inc., according to Wally Tierney, an employee of Automatic Fire Control Systems, Inc.

16. Mr. Schonlau testified that there were work stoppages on the project because defendant did not have adequate material to complete the job. Mr. Tierney testified that the job never halted as a result of material shortages or inappropriate materials furnished by plaintiff. The Court finds that the more credible evidence indicates that the work on the project never stopped due to plaintiff's failure to deliver materials under the agreement.

17. For several weeks, defendant and the subcontractor attempted to get the compressor to maintain air pressure on the system. The air compressor starts the system. Defendant had numerous problems in getting the system to settle down. Generally, it takes forty-eight to seventy-two hours for the system to settle down. Due to these problems, defendant used a second air compressor to assist the original for the purpose of maintaining pressure. This second air compressor was not in the drawing given to plaintiff showing what equipment was needed for this job. After two or three weeks of repairing leaks, the system finally settled down so that one compressor would maintain it while a second compressor was on stand by.

18. Once the system worked, there were still difficulties. The single compressor was not maintaining the system while the second compressor would continuously stop and start at different intervals.

19. Mr. Schonlau consulted the subcontractor daily about the recurring problems with the system. A determination was made that the air pressure was not maintained because the sprinkler heads were leaking.

20. Because of this determination, subcontractor Tierney removed some sprinkler heads from the system and returned them to Viking Valve Company, the manufacturer of the sprinkler heads. A representative of Viking Valve Company notified Mr. Tierney that there were approximately 600 to 700 defective sprinkler heads shipped to defendant. The sprinkler heads delivered to defendant were straight threads rather than tapered threads. This caused the sprinkler heads not to seal properly when

installed on the pipes. The standard thread is a tapered thread.

21. A representative of Viking Valve Company told subcontractor Tierney to return the defective sprinkler heads. The fire sprinkler system was shut down so that Mr. Tierney could remove all of the installed sprinkler heads to ship back to Viking Valve Company. At that time, 600 to 750 sprinkler heads had been installed.

22. In September 1985, Viking Valve delivered to defendant 600 of the 1,000 tapered thread sprinkler heads, and plaintiff provided the remaining 400.

23. In late September 1985, subcontractor Tierney installed the second shipment of sprinkler heads in four days at Viking Valve Company's expense.

24. After the new heads were installed, the system still failed consistently to maintain adequate pressure.

25. Mr. Schonlau testified that he believes the fire sprinkler system failed to hold adequate pressure and had continuing leaks because the threads in the pipe to which the sprinkler heads were inserted were damaged when the defective sprinkler heads (i.e., without the tapered threads) were installed.

26. Defendant has been required to return to the warehouse multiple times to remove, reseal, and re-install sprinkler heads.

27. Each time defendant returns to the warehouse for repair, the system has to be depressurized. The leaking sprinkler heads have to be removed. The replacement heads, if being placed in the freezer, have to be placed in an area where they can get cold prior to replacement. There is a discrepancy in Schonlau's testimony at trial and his deposition testimony regarding whether or not the replacement heads have to be warmed or cooled down prior to replacement. In his deposition testimony, Schonlau stated that the replacement heads had to be warmed prior to their placement on the pipes. Mr. Tierney testified that the replacement sprinkler heads had to be the same temperature as the room where they were being replaced. The Court finds that the replacement sprinkler heads must be the same temperature as the room of replacement. The sprinkler heads are then screwed back into the pipe, resealed, and the system is repressurized.

28. After the system was installed through November 20, 1986, defendant has been damaged due to defective materials in the amount of $12,654.02 for man hours and equipment rental for repair of the fire sprinkler system.

29. Mr. Schonlau testified that he has never experienced having to return to a job site the number of times that this particular installation has required. Each time, the alarm call has been for loss of air pressure due to leaking sprinkler heads and threadlets.

30. Mr. Schonlau testified that he did not know the amount of damages that defendant would be incurring in the future due to repairs on the fire sprinkler system.

31. Mr. Schonlau testified that prior to the filing of the instant suit, he contacted Phil Barrett about all the problems relating to materials and equipment shipped by plaintiff for the installation of the fire sprinkler system, including the problems of leakage after the second shipment of sprinkler heads were installed.

32. Due to the leakage problems from the second shipment of fire sprinkler heads, Mr. Schonlau returned four sprinkler heads to the manufacturer, Viking Valve Company, to determine if they were defective. Viking's quality control department performed numerous tests on the four sprinkler heads. The tests revealed that the sprinkler heads were in compliance with manufacturer's specifications and not defective.

33. George Wirsch, an assistant manager of technical services at Viking Valve Company, testified that it was his opinion that installation of a straight threaded head into a female connector set for a tapered thread would not cause damage to the female connector. The Court notes that Mr. Wirsch only examined the second shipment of heads that were not defective. Mr. Wirsch did not examine the first heads,

nor did he look at the damaged pipe. Moreover, he indicated that damage to the pipe due to the installation of the first shipment could be a possibility. The evidence further indicated that Mr. Schonlau never had to return to a job site for repair due to loss of air pressure the number of times he did with this project. Therefore, the Court finds that the defective sprinkler heads caused damage to the pipe.

34. On October 14, 1985, defendant paid $25,000.00 to plaintiff on the contract price.

35. Plaintiff knew the purpose for which the goods were intended.

36. Plaintiff's failure to deliver equipment and providing defective goods was a breach by plaintiff of the contract.

### Conclusions of Law

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

█ 2. A suit on account is an action in contract. *Flo–Products Co. v. Valley Farms Dairy Company,* 718 S.W.2d 207, 208 (Mo.App.1986). The elements of this action are: (1) defendant requested plaintiff to furnish the merchandise; (2) plaintiff furnished the goods; and (3) the charges were reasonable. *Coca–Cola Bottling Co. v. Groeper,* 691 S.W.2d 395, 397 (Mo.App.1985).

3. Cover is the "making in good faith and without unreasonable delay any reasonable purchase of ... goods in substitution for those due from the seller." Mo. Rev.Stat. § 400.2–712(1) (1986).

█ 4. Under Missouri law, without an agreement as to amount of interest to be charged, the maximum amount is 9%. *Bartlow–Hope Electrical Corp. v. Herzog,* 692 S.W.2d 404, 406 (Mo.App.1985).

█ 5. In the present case, two elements for a cause of action on account have been met: (1) defendant requested plaintiff to furnish the material and equipment, and (2) the charges were reasonable. The requirement that the goods be furnished by the plaintiff has not completely been met. Plaintiff failed to deliver to the

defendant all the material and equipment required by the contract. Therefore, defendant is entitled to a setoff for having to purchase material and equipment on the open market due to plaintiff's failure to deliver certain items.

6. The initial contract price was $62,500.00. An additional $481.81 in material not provided for in the original contract was provided to defendant. Shipping charges amounted to $1,016.57. The total of these figures amounts to $63,998.38. Subtracting defendant's payment made on October 14, 1985, in the amount of $25,000.00, a balance of $38,998.38 remains. Plaintiff concedes that the amount of $974.85 for an air compressor, and $1,017.74 for extra material and labor supplied by the subcontractor, should be credited to the $38,998.38 figure. The Court notes that these two figures are a part of the total figure of $5,975.13 which defendant contends is the total amount of undelivered goods. Subtracting $1,992.59 ($974.85 plus $1,017.74) from $38,998.38 leaves a balance of $37,005.79, which plaintiff now seeks to recover.

7. Since plaintiff conceded the amount of $1,992.59,[1] defendant contends that it incurred $3,982.54 ($5,975.13 minus $1,992.59) due to plaintiff's failure to deliver various items. This figure represents the amount used to purchase substitute goods including $974.85 for the second air compressor, two Deltech dryers in the amounts of $432.32 and $1,872.25, and material and labor in the amount of $703.12 supplied by Automatic Fire Control Systems, Inc. Plaintiff objects to the $703.12 figure because it represents material and labor supplied by Automatic Fire Control Systems, Inc. However, Mr. Schonlau testified that this labor and material was needed due to plaintiff's failure to deliver materials and accessory items. Plaintiff also objects to the $974.85 figure because it was for a second air compressor. The evidence reflects that the decision to add a second air compressor was made after the quote for the original contract was given. The

---

1. The Court notes that plaintiff deducted the open market price for the items conceded.

second air compressor was purchased because the system was not maintaining pressure. This was due to the first shipment of leaking defective heads. The defective sprinkler heads were not discovered until after the second compressor was purchased. Although plaintiff objects to the figure for the dryers, Mr. Schonlau testified that these dryers were never delivered and were part of the original contract. Subtracting the total amount of the goods not delivered which defendant was instructed to purchase on the open market, the Court finds that the total figure of $3,982.54 to be reasonable and should be set off against $37,005.79, which equals $33,023.25. *See Evans Products Company v. Veneers, Inc.*, 332 F.Supp. 1199, 1201 (E.D.Mo.1971). The Court further finds that there was no agreement made by defendant to pay the 1½% interest appearing on plaintiff's invoice. Therefore, plaintiff is entitled to interest on its account balance at the rate of 9% per year from July 20, 1985, the date on which the debt became due. Mo.Rev.Stat. § 408.020 (1986); *Bartlow–Hope Electrical Corp. v. Herzog, supra.*

Accordingly, judgment will be entered in favor of plaintiff and against defendant on plaintiff's complaint in the amount of $33,023.25.

8. In its counterclaim, defendant asserts that plaintiff failed timely to deliver material and equipment, causing delay of and expense to defendant's work on the project and requiring the purchase of additional material. Defendant further claims that the installation of the first shipment of defective heads supplied by plaintiff caused damage to the pipe work.

9. To the extent defendant requests additional damages on the ground that plaintiff failed timely to deliver material, the request will be denied as the project never halted as a result of material shortages or inappropriate materials furnished by plaintiff. Moreover, defendant has received a set off against the amount awarded on plaintiff's complaint based on this ground.

10. "The Uniform Commercial Code implies warranties for contracts for the sale of goods by merchants." *Larry Goad and Co. v. Lordstown Rubber Co.*, 560 F.Supp. 583, 587 (E.D.Mo.1983). Mo.Rev.Stat. § 400.2–314 (1986) provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale." In order for goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." Mo.Rev.Stat. § 400.2–314(2)(c) (1986).

11. In addition to providing for the existence of implied warranties, Mo.Rev.Stat. § 400.2–714(2) and (3) states the measure of damages in the event of a breach:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under section 400.2–15 may also be recovered.

12. Incidental damages, as defined by Missouri courts are "expenses reasonably incurred in care and custody of goods rightfully rejected and any reasonable expense incident to the breach," and consequential damages as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented." *O'Brien v. Wade*, 540 S.W.2d 603, 606 (Mo. App.1976). Thus, Missouri law provides that a buyer may recover for economic loss resulting from the sale of an unmerchantable product if the loss is proximately caused by the breach and the buyer had in good faith mitigated the damages. *Groppel Co. v. U.S. Gypsum Co.*, 616 S.W.2d 49, 59 (Mo.App.1981).

13. The evidence indicates that the plaintiff committed a breach of its warranty of merchantability by selling defective sprinkler heads to the defendant. Plaintiff conceded that the first shipment of sprinkler heads was defective. However, by the

time the defect was reasonably discoverable after the defective heads were installed, the damage to the pipe work resulting from the defects had occurred.

14. Pursuant to Mo.Rev.Stat. § 400.2–714(2), this is a case where special circumstances show proximate damage of a different amount, rather than the difference between the value of the goods accepted and the value if they had been as warranted. The damages caused include (1) damage to the pipes causing ineffective sealing; (2) failure to maintain adequate pressure; and (3) expense of repairing leaks on a continuing basis were foreseeable and reasonable expenses incident to the breach. *Havens Steel Co. v. Randolph Engineering Co.,* 613 F.Supp. 514 (W.D. Mo.1985), *aff'd,* 813 F.2d 186 (8th Cir.1987); *Larry Goad and Co. v. Lordstown Rubber Co., supra; Carboline Co. v. B.C.D. Co., Inc.,* 712 S.W.2d 453 (Mo.App.1986). However, the Court finds that in addition to plaintiff's late delivery and improper materials initially furnished, plaintiff can nonetheless not be held responsible for all the damages in the amount of $12,654.02 because of several intervening forces.

15. In rebuttal, plaintiff called defendant's own subcontractor, Wally Tierney, who worked on this job and testified he had not been paid for $1,017.74, one item sought by defendant here. Tierney further testified that the job never came to a halt due to shortages of materials. Mr. Tierney also testified that he installed or replaced cold sprinkler heads in the freezer and not hot sprinkler heads.

Because of the conflicts in defendant's counterclaim and other crucial testimony, the Court finds some counterclaim damages suffered by defendant but not in the asserted amount of $12,654.02. The Court will disallow all but $6,500.00 thereof.

16. To the extent defendant requests an additional $30,000.00 in prospective damages, this will be denied. These damages are not reasonably foreseeable but are speculative in light of the fact that defendant's own witness could not estimate a figure for future damages.

