Anna Marie **PANETTIERE**, Respondent,

v.

Frank Joseph **PANETTIERE**, Appellant.

No. WD 51654.

Missouri Court of Appeals,
Western District.

April 1, 1997.

As Modified May 27, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 1997.

Mary Ann Drape, Kansas City, for appellant.

Kay Madden, Kansas City, for respondent.

Before BRECKENRIDGE, P.J., and SPINDEN and LAURA DENVIR STITH, JJ.

BRECKENRIDGE, Presiding Judge.

Frank J. Panettiere (Husband) appeals the trial court's judgment dissolving his marriage to Anna M. Panettiere (Wife). He contends that the trial court erred by ordering him to pay child support in addition to college tuition and other expenses. He also appeals the court's division of marital property and its failure to recognize a marital debt owed to his father. The judgment is affirmed in part, and reversed and remanded in part.

Husband and Wife were married on June 15, 1974. They have three children: Margaret Ann Panettiere, born on July 19, 1975; Frances Ann Panettiere, born on October 29, 1977; and Salvatore Frank Panettiere, born on August 21, 1982. At the time of trial, Margaret had completed her second year of college at Northwest Missouri State University. Frances had recently graduated from high school and planned to attend Northwest Missouri State along with her sister. The youngest child, Salvatore, was twelve at the time of trial.

Wife filed a petition for dissolution of marriage on April 8, 1994, in the Circuit Court of Jackson County. On July 19, 1995, the trial

court entered an order dissolving the marriage and awarding the parties joint legal custody of the children with primary physical custody to Wife. The custody order is not challenged on appeal. Both parties waived maintenance in open court.

The trial court ordered Husband to pay child support in the amount of $207 per child, for a monthly total of $621. Although each party submitted a Form 14 to assist the court in its determination of the presumed amount of child support, the court rejected the parties' forms and calculated its own Form 14 using numbers most closely resembling those submitted by Wife.[1] In addition, the court found the Form 14 support amount "unjust and inappropriate with regard to college tuition and unreimbursed medical expenses," and ordered each party to pay one-half of the tuition costs for the children's post-secondary education. Husband was ordered to provide medical insurance and the parties were ordered to divide equally "all medical, dental, orthodontic, optical, psychiatric, psychological and prescriptive drug costs not covered by insurance."

At the time of the trial, the parties owned a home in Lee's Summit, Missouri, along with three rental properties located in Blue Springs, Missouri. All of these properties were acquired during the marriage. The parties stipulated that the rental properties had a combined debt of $279,707 and that the equity in the properties totalled $102,793. The parties also stipulated that the value of the marital home equalled $170,000, but they disagreed on the amount of equity in the home due to Husband's claim that there was an outstanding loan from his father which was used to pay off the mortgage on their home.

With regard to the parties' real property, the trial court expressly found "[t]hat no competent evidence was presented to substantiate [Husband's] claim the parties owe money to [Husband's] father for the marital home, there being no deed of trust or note evidencing a loan." Therefore, the trial court found that the equity in the home was equal to the stipulated value of $170,000.

Wife was awarded the marital home and Husband was ordered to execute a quit-claim deed to Wife for the home. In return, Husband was to receive a promissory note from Wife in the amount of $15,000, secured by a deed of trust against the marital home. Husband was awarded the rental properties and Wife was ordered to execute a quit-claim deed to Husband for each property.

The court further found that there were four cars acquired by the parties during the marriage, and awarded Wife the 1994 Mercury Sable and Husband the 1991 Oldsmobile Cutlass. The two cars driven by the daughters, 1992 and 1994 Mitsubishi Eclipses, were set aside to the daughters. This disposition was based on a finding that the cars were intended as gifts from Husband, even though the cars were titled in Husband's name at the time of trial.

The trial court also considered and assigned responsibility for the marital debts. Husband was expressly ordered to hold Wife harmless for the debts assigned to him and to fully indemnify her for any expense incurred, including attorney fees, resulting from the non-payment of any debt assigned to him. Wife was ordered to do the same for the debts assigned to her. Husband was assigned the responsibility to pay the mortgages for the rental properties and the loans on the two cars set aside to the daughters, as well as other smaller debts. Wife was assigned the responsibility to pay the loan for her car, along with the debts she had accumulated since the parties separated.

Husband presented evidence that his father, Salvatore Panettiere (Mr. Panettiere), loaned Husband and Wife approximately $80,000 during the course of their marriage, including the amount he claimed was an indebtedness on the marital residence. Wife acknowledged money had been received from Mr. Panettiere, but disputed that there was an obligation to repay any funds received. The court ruled that "[a]ny monies owed to Salvatore Panettiere is [sic] a moral obligation on the part of [Husband]."

---

1. The court did not find Husband's claim as to his current employment credible and imputed to him a higher income ability. Husband did not appeal this finding.

A dissolution decree will be affirmed unless there is no substantial evidence to support it; it is against the weight of the evidence; or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Woolridge v. Woolridge*, 915 S.W.2d 372, 375 (Mo.App. 1996). The party challenging a dissolution decree bears the burden of demonstrating error. *Woolridge*, 915 S.W.2d at 375; *Cofer v. Price–Cofer*, 825 S.W.2d 369, 373 (Mo.App. 1992). A judgment should be set aside with caution and only on a firm belief that the judgment is wrong. *Fulton v. Adams*, 924 S.W.2d 548, 551 (Mo.App.1996).

Husband initially argues that the court's order awarding child support was an erroneous application of the law and not based on substantial evidence. He claims that he should not be required to pay the loans on the daughters' cars and one-half of the college tuition costs for the children's post-secondary education in addition to the Form 14 amount of child support for each child.

As part of its order for child support, the trial court ordered each party to pay one-half of the cost of tuition. The court entered this order after finding that "[t]he evidence was not sufficient to determine the actual cost of tuition, room and board, fees, books or other expenses," and stating that it was unwilling to speculate to enter an order regarding all college expenses. Specifically, the order read:

> 6. The parties shall each pay one half of tuition costs at an institution of vocational or higher education should the minor children attend such institution. Said obligation shall be limited to the equivalent of tuition at Northwest Missouri State, for a total of eight (8) semesters, and after application of all available financial aid.

In addition, the court ordered Husband to pay $207 per month per child, the amount calculated by the court pursuant to Form 14.

At trial, both parties presented evidence regarding the expenses, in addition to the costs of tuition, which the children attending college would incur, such as room and board, books, and other living expenses.

The testimony of a party as to a child's expenses is sufficient evidence on which to base an award of child support, and the expenses need not be proved with absolute particularity. *DeCapo v. DeCapo*, 915 S.W.2d 343, 350 (Mo.App.1996); *Davies v. Davies*, 887 S.W.2d 800, 804 (Mo.App.1994). As the trial court found, however, the lack of particularity prevented the court from entering an order requiring each parent to pay a portion of the specific non-tuition expenses. But, the evidence did demonstrate that the children at college have needs beyond tuition. Wife, as the primary custodian receiving support payments, is responsible for the children's living expenses while they are away at college. *See Echele v. Echele*, 782 S.W.2d 430, 438 (Mo.App.1989). By requiring Husband to pay Form 14 support for the children attending college, the court is ensuring that Husband contributes to their non-tuition expenses.

Husband further argues that the court's child support award is different from what either of the parties requested and, therefore, is not supported by the evidence. At trial, Husband expressed his wish to either pay child support for the daughters or one-half of tuition costs, but not both. Wife asked the court to order Husband to pay sixty percent of *all* college expenses, rather than regular child support. Both parties were in agreement that Husband should pay support for their son, but they could not agree on the amount.

The trial court did not err in choosing not to award support pursuant to the request of one or both parties. It is well settled in Missouri that a trial court has wide discretion in setting child support awards. *Holmes v. Holmes*, 878 S.W.2d 906, 909 (Mo. App.1994). The court setting the award is not bound by any agreement between the parties, nor is it required to enter an award according to the wishes of one or both parents. *Jones v. Jones*, 903 S.W.2d 277, 281 (Mo.App.1995) ("Agreements between parents that concern minor children are merely advisory.").

Next, Husband argues the child support award is an erroneous application of the

law for two reasons. First, he contends the amount ordered is "facially vague" and uncertain with respect to the costs of tuition because the order does not mirror the proposed order set forth in *Echele.* The *Echele* case suggested five criteria for a trial court to consider when fashioning a readily certain and enforceable support award which requires a noncustodial parent to provide financial assistance for a child's post-secondary educational expenses. 782 S.W.2d at 437; *DeCapo,* 915 S.W.2d at 347. The proposed order suggested in the *Echele* case included specific definitions of terms, such as the "costs" covered by the order, the minimum number of credit hours the child must maintain, the number of semesters covered by the order, and a designated institution to cap the maximum amount of expenses for which a parent will be responsible. 782 S.W.2d at 437.

■ Although the descriptive criteria set forth in *Echele* is a desirable format, it is not necessary in all cases. Several of the criteria included in that order address the problem of quantifying total expenses for education, not simply the cost of tuition. *Id.* Other suggestions, such as requiring the child to carry a "full load" may be desirable, but are not necessary to render the order enforceable. *Id.* Since the order in the present case only requires the payment of tuition costs, the specificity suggested in *Echele* is unnecessary.

■ Generally, a judgment or decree must be definite and certain as to the amount rendered in order to be enforceable. *Fulton,* 924 S.W.2d at 551. An order for child support is enforceable if, upon a motion and a hearing, the exact amount due may be determined by a ministerial computation. *Id.*; *Echele,* 782 S.W.2d at 434. Here, the trial court's order is sufficiently definite and certain because the cost of tuition at Northwest Missouri State is subject to ministerial computation. Therefore, the education provision of the order is fully enforceable.

■ Second, Husband argues that the order is facially vague because the court included the phrase "after application of all available financial aid" without delineating a

maximum cost or indicating whether the order is enforceable if no one actually applies for financial aid. In the past, Husband and Margaret have obtained loans. For the coming school year, Frances received a $500 scholarship, but no one had applied for any other financial aid.

■ In construing the trial court's judgment, this court examines the language of the judgment in its entirety and determines the intention of the trial court from all parts of the judgment. *Woodfill v. Shelter Mut. Ins. Co.,* 878 S.W.2d 101, 103 (Mo.App. 1994). The words and clauses used in a judgment are to be construed according to their natural and legal import. *Id.* Supreme Court Rules which affect a judgment "become a part of it and must be read into the judgment as if an express provision to that effect were inserted in it." *State ex rel. Chaney v. Brown,* 673 S.W.2d 510, 511 (Mo. App.1984).

■ Paragraph E of the Comments for Use to Form 14, which is used to calculate the presumed amount of child support pursuant to Supreme Court Rule 88.01, discusses the relationship between support awards and post-secondary education expenses, and provides, in part:

> Post-secondary educational expenses can be ordered by the court if it is determined by the parents or the court to be appropriate for the parents to contribute to the costs of such programs. To determine an appropriate amount, the court may consider annual tuition expenses, room and board expenses, including room and board expenses for a child residing in the home of one parent while attending school or during school recesses in excess of 30 days and other reasonably necessary expenses. *In addition, the court should consider scholarships, grants, stipends and other cost reducing programs available to the student.* ...

(emphasis added). The Eastern District of this court recently interpreted Comment E as a clear statement that any court order for the payment of educational expenses should properly be based on actual out-of-pocket cost to the student. *Anderson v. Aronberg,*

927 S.W.2d 931, 934 (Mo.App.1996). In determining a student's out-of-pocket cost, loans should not be included since loans do not reduce the actual cost, but merely delay the date of payment of the cost.

■ "This court presumes that the trial court followed the law unless that presumption is refuted by the record." *Fulton*, 924 S.W.2d at 554. *See also Hubbs v. Hubbs*, 870 S.W.2d 901, 907 (Mo.App.1994). Since the record does not refute this presumption, this court interprets the trial court's reference to "financial aid" in its order of support to mean "scholarships, grants, stipends and other cost reducing programs," as set out in Comment E above.

Therefore, Husband is required to pay one-half of the actual out-of-pocket tuition costs for the children's attendance at an institution of vocational or higher education, reduced by any scholarships, grants, stipends or other cost reducing monies actually received. The maximum he would be liable to pay would be one-half the full amount of tuition at Northwest Missouri State, if no scholarships, grants, stipends and other cost reducing programs are applied for and awarded to the children.

■ Next, Husband alleges that the court erroneously applied the law when it ordered him to pay child support because the "record in this case is void of any reference to compliance with Rule 88.01." In effect, Husband argues that the court ordered an amount of child support different from the Form 14 amount without making a specific finding that the Form 14 support amount was "unjust or inappropriate", in accordance with Rule 88.01.

■ Supreme Court Rule 88.01 establishes a rebuttable presumption that child support calculated pursuant to Form 14 is the amount to be awarded by the trial court. Rule 88.01(e); *DeCapo*, 915 S.W.2d at 346; A written finding that the Form 14 amount, after considering all relevant factors, is "unjust or inappropriate" will overcome this presumption. *DeCapo*, 915 S.W.2d at 346. "Missouri law does not permit a child support award that deviates from the Form 14 calculation unless the trial court finds on the record that the Form 14 amount is unjust or inappropriate." *Id.* at 347.

Contrary to Husband's argument, the trial court complied with Rule 88.01 by explicitly stating in its Findings and Recommendations that the application of the child support guideline is unjust and inappropriate. The trial court obviously believed that the amount rendered by the Form 14 calculation should be rebutted because the amount was insufficient, in that it awarded additional support. The court's finding satisfies the requirements of Rule 88.01 and allows the court to order an award in excess of the amount determined by Form 14.

■ Husband's final challenge to the child support order is that the trial court erred by ordering him to pay one-half of the daughters' college tuition and their car payments without abating his obligation to pay monthly child support. Husband argues that the order requiring him to pay the loans for the two Mitsubishi Eclipses constitutes additional support for his daughters. To resolve this issue, we must first resolve Husband's related claim that the cars were improperly awarded to the daughters. The basis of his claim is that the vehicles were titled in his name and, as such, were marital property subject to division between Husband and Wife. As support for this argument, Husband cites *Tinger v. Tinger*, 709 S.W.2d 123 (Mo. App.1986).

In *Tinger*, the court held that the trial court erred in awarding a car to the parties' child because the title, held in the parties' names, conclusively established the car as marital property subject to division between husband and wife. *Id.* at 124. It made no difference to the *Tinger* court that the daughter was using the car for her own personal use and had possession of the car.

■ Wife attempts to distinguish the instant case from *Tinger* by arguing that the *Tinger* court was not faced with a gift situation, whereas here, the court found that Husband intended the cars as gifts to the daughters. This argument, however, "fails to recognize the unique status that motor vehicles occupy in our society." *Jones v. Ford Motor Credit Co.*, 607 S.W.2d 179, 180

(Mo.App.1980). Under Missouri law, it is clear that the transfer of ownership of an automobile mandates strict compliance with the requirements of § 301.210, RSMo.1994.[2] *Tinger,* 709 S.W.2d at 124. These statutory requirements must be rigidly enforced and absolutely complied with. *Jones,* 607 S.W.2d at 181. In *Metro Auto Auction v. Director of Revenue,* 707 S.W.2d 397, 403 (Mo. banc 1986), the Missouri Supreme Court stated that

> Missouri is a "strict title" state which means "the assignment of the certificate of title in the manner provided by the statute is the *exclusive* and *only* method of transferring title to a motor vehicle, whether the transfer is made by the owner by way of sale or *gift* or is effected by operation of law."

(quoting 7A Am.Jur.2d Automobiles and Highway Traffic § 30 (1980)) (emphasis added).

In this case, there was no completed gift of the cars by Husband to the daughters in the absence of a valid assignment of title in strict compliance with the statutory requirements. Trial courts have broad power under § 452.330, Cum.Supp.1996, to divide and distribute marital property, but where a vehicle is titled to a husband and/or wife, the vehicle cannot be distributed to a third party. *See Tinger,* 709 S.W.2d at 124. The order of the trial court setting aside the two Mitsubishi Eclipse automobiles to the daughters is reversed and remanded for a distribution between Husband and Wife, at the discretion of the trial court.

With regard to the car payments, the court specifically found that they were marital debt and assigned Husband the responsibility to pay for them. As such, the car payments are not child support and the current assignment of debt for the car loans to Husband was supported by the evidence. Nonetheless, this court finds that the order

requiring the payment of the debt on the vehicles is so closely entwined with the award of the vehicles, that a complete reversal of the judgment pertaining to the two Mitsubishi Eclipse automobiles is required. *See Cummins v. Cummins,* 873 S.W.2d 280, 282 (Mo.App.1994). On remand, the trial court is free to modify its earlier allocation of the debts on the vehicles based on a new division of the cars, if it so desires. *Id.* Therefore, the order requiring Husband to pay the indebtedness on the two Mitsubishi Eclipse automobiles is reversed and the matter remanded for further proceedings. Point I is otherwise denied, and the award of child support is affirmed.

In his third point, husband challenges the trial court's disposition of the marital debt allegedly owed to Husband's father. Husband presented evidence that Mr. Panettiere loaned the parties over $80,000 during the marriage. He argues that the court's order that "any monies owed to Salvatore Panettiere is [sic] a moral obligation on the part of [Husband]" is so vague and indefinite as to be unenforceable, and is against the substantial weight of the evidence. He argues that the court erred by not considering the debt to his father in the division of marital property and debt.[3]

In August of 1978, the parties purchased their first home, a duplex in Kansas City, Missouri. Mr. Panettiere made a gift of the downpayment for the home, but also loaned the parties $20,000 for "air conditioning and furnaces." On August 8, 1978, both parties signed a promissory note which read in its entirety:

> For value received we promise to pay to SALVATORE PANETTIERE the sum of Twenty Thousand [sic] Dollars ($20,000.00), on demand or upon the sale of the real estate located at 219 North Gladstone,

2. All statutory citations refer to the Revised Missouri Statutes, 1994, unless otherwise noted.

3. In Husband's brief, the argument section for the third point included several other assignments of error which were not addressed in the point relied on, such as the court's finding of marital misconduct warranting "a disparate division of property and debt," claiming these findings were unsupported by the evidence. This court will not review the arguments which Husband attempts to make in the argument section of his brief which are not related to his point relied on. *Hutson v. Blazin' Saddle Entertainment,* 930 S.W.2d 70, 71 (Mo.App.1996).

Kansas City, Jackson County, Missouri, whichever first occurs, without interest.

When this home was sold in 1985, Mr. Panettiere told the parties to use the $20,000 to increase the downpayment on their new home instead of demanding payment on the note. He testified that he was not repaid the $20,000,

> [b]ecause they were building—going to build another house and wanted their payments to be low. So I just told them to take that and add it on to that, so they'd have a small downpayment, so they could—they could make it, you know, because their payments would be high, you know.

In fact, the parties made no payments on the $20,000 note and the applicable statute of limitations for collecting the note has run. Section 516.110. *See also Matter of Estate of Whitehead*, 895 S.W.2d 129, 131 (Mo.App. 1995).

Upon the sale of the Kansas City home, the parties purchased a new home in Lee's Summit, Missouri for $135,000. They made a downpayment of $88,000 from the proceeds from the sale of the Kansas City home, inclusive of the funds from Mr. Panettiere. In 1990, the parties paid off their mortgage on the Lee's Summit home. Husband testified that they were suffering financial difficulties at this time and he was concerned about missing mortgage payments. To alleviate the problem, Husband claims that his father loaned them $44,853.31 to pay off the mortgage.

According to Wife, the mortgage on their residence in Lee's Summit was paid with money received from the condemnation of Husband's business, Topper's Market. She testified that Husband discussed with her using money from the proceeds of Topper's Market to pay the mortgage, and then he told her and others that "the house was paid off." Wife testified that if there was evidence of a debt to Mr. Panettiere for a mortgage, it was only because Husband advised her he was going to make it appear as if there was still a mortgage so he could get tax advantages. She testified it was not Mr. Panettiere's money that paid off their mortgage, however, but their own. Contrary to

Husband's claim of financial difficulty when the mortgage was paid off, Wife claims that their financial circumstances were "pretty good," and she first heard of a debt to her father-in-law for the mortgage when she mentioned leaving Husband.

Both Husband and Mr. Panettiere conceded that there was nothing in writing documenting the making of the alleged 1990 loan, much less a mortgage on the Lee's Summit home. As evidence of the loan, Husband presented an amortization schedule his accountant prepared in 1992 showing a payment plan of $550 per month, with ten percent interest. Husband testified that this amortization schedule was created when Mr. Panettiere loaned Husband and Wife an additional $7,910 to pay off the parties' two cars. Husband claimed he was consolidating the parties' debts on their home and vehicles in 1992, because they were still having financial problems. Husband also presented evidence that Mr. Panettiere loaned the parties an additional $10,000 to pay property taxes on the parties' residence and the rental properties for 1993 and 1994.

There were no payments on the "loans" between 1978 and 1992, except one check from Husband to Mr. Panettiere for $483.58 in 1990. Mr. Panettiere testified this check was a payment on the $44,853.31 loan. Mr. Panettiere further testified that, during 1992, five payments were made on the $44,853.31 loan, and his income tax return for that year reflected interest income from these payments in the amount of $1,309. In 1993, Mr. Panettiere's tax return showed interest income from Husband of $4,108, while the parties' tax return showed a $4,000 deduction for mortgage interest.

The interest paid on the 1993 tax returns reflected payments made by Husband as part of an "exchange." Mr. Panettiere and Husband had an arrangement where Mr. Panettiere lived in an apartment owned by the parties. Mr. Panettiere would write Husband a check for the $400 monthly rental. Husband would then give the money back to Mr. Panettiere with "a little extra," as a payment on the "mortgage" on the Lee's Summit property. There was no claim of any payments in 1994 or 1995. Wife testified

that she was not aware of any payments made to Mr. Panettiere for a loan to pay the mortgage on the home in Lee's Summit.

Mr. Panettiere testified at trial that the transfers of funds to the parties were loans, not gifts, and he expected to be repaid. He stated that Italians do not require promissory notes from family, but explained that a note was executed for the 1978 loan because, "I didn't have a lot of money extra, and I wanted that money." Mr. Panettiere further testified that he was not going to pressure the parties for payment of the debts. He indicated he would be willing to wait until the marital residence sold to recapture any money he loaned them, but he would prefer monthly payments.

The court expressly found that Husband failed to present competent evidence to substantiate his claim that the parties owe money to Husband's father for the marital home, "there being no deed of trust or note evidencing the loan." The court then disposed of the alleged debts by finding that "[a]ny monies owed to [Mr.] Panettiere is [sic] a moral obligation on the part of [Husband]."

■ This court defers to the trial court's ability to draw conclusions where there is conflicting testimony and to weigh the credibility of the witnesses, their sincerity, character, and other "trial intangibles" which the record may not reflect. *Allen v. Allen,* 927 S.W.2d 881, 887 (Mo.App.1996). Whether or not the funds transferred to the parties were bona fide loans from Mr. Panettiere with a continued expectation of repayment was purely a question of fact, heavily dependent on the trial court's determination of the credibility of the witnesses. *See Cole v. Cole,* 633 S.W.2d 263, 265 (Mo.App.1982).

The trial court's order concerning Husband's claim of debts to his father is not against the weight of the evidence. There is sufficient substantial evidence to support the court's determination that the parties did not owe Husband's father for a loan on the Lee's Summit home. *See Rogers v. Rogers,* 803 S.W.2d 92, 98 (Mo.App.1990). Wife testified that the $44,853.31 payoff of the mortgage on the marital residence was made with the marital funds of the parties, and not with Mr. Panettiere's funds. Wife was told by Husband that their home was "paid off," after Husband discussed with her using the condemnation proceeds from his business to pay the mortgage. There was no document purporting to create an indebtedness on real estate. In addition, the only payments made on this alleged indebtedness were in 1992 and 1993. The 1993 payments were pursuant to an agreement between Husband and Mr. Panettiere to exchange rent money for "mortgage" payments. This exchange is consistent with Wife's testimony that Husband was making it appear as though there was a mortgage so that he could receive tax benefits. These payments were made without Wife's knowledge.

■ Although there was a written promissory note evidencing the transfer of the $20,000 to improve the parties duplex in Kansas City, the loan was made sixteen to seventeen years earlier and no payments were ever made on that note. When the parties were buying their present home, Mr. Panettiere encouraged them to use the funds he had loaned them to increase their downpayment. The other transfers of funds from Mr. Panettiere did not involve the execution of promissory notes or written agreements, and no payments have been made. Considering this evidence, the trial court did not err in finding that the funds transferred by Mr. Panettiere to the parties were not debts of the parties to be considered in the division of marital property, because there was no real expectation that Mr. Panettiere would seek repayment for these amounts. Any liability which a party is not likely to have to pay may be excluded as a marital debt. *See Levis v. Levis,* 713 S.W.2d 561, 564 n. 1 (Mo.App. 1986).

■ Nor is the trial court's order concerning the alleged indebtedness so vague and uncertain as to be unenforceable. The intention of the trial court can be ascertained from an examination of its judgment. *Woodfill,* 878 S.W.2d at 103. The language of the trial court indicates that it found that there were no valid enforceable debts to Mr. Panettiere which should be considered in the division of the marital property. The language indicates that the court rejected the testimony of Husband and Mr. Panettiere that Mr. Panettiere was making loans to the

parties when he gave them funds, for which he had a continued expectation of repayment.[4] The trial court's reference to a "moral obligation" indicates its belief that if Husband repays his father at some point in the future, it will be because of a personal or "moral" duty, rather than because of a legal obligation.

The court's finding is supported by the circumstances of Mr. Panettiere's transfer of funds to the parties, and his pattern of dealing with them over a seventeen year period. It can be reasonably inferred that Mr. Panettiere was only demanding repayment to give his son an advantage in the dissolution of marriage proceeding. Point three is denied.

Husband's final challenge to the trial court's order, in his fourth point, concerns the characterization and distribution of the 1991 Oldsmobile Cutlass as marital property. He argues that allocating the car as marital property was erroneous and not based on substantial evidence because the car belongs to his father. Although Husband was awarded the car, he contends that including the car in the marital property division decreased the amount of money Wife was ordered to pay him upon sale, or other disposition, of the marital home. Wife responds that the court's order was based on substantial evidence and any harm suffered by Husband as a result of classifying the car as marital is mere speculation.

There was evidence in the record that Mr. Panettiere gave the car to Husband and Wife in 1992, well within the marriage of the parties, giving rise to the presumption under § 452.330.2 that the car was marital property. Wife testified that Mr. Panettiere had given the car to them to "help our family out, because we needed another car." In his Statement of Marital, Nonmarital Property and Liabilities, submitted to the trial court, Husband initially included the car as marital property, but later drew a line through it. The only evidence supporting Husband's claim consists of his bare assertion at trial that the car belongs to his father. He did not present any written proof of ownership. Nor did he ask Mr. Panettiere whether the

car belonged to him while Mr. Panettiere was on the stand.

As noted above, the trial court is in the best position to judge the credibility of the witnesses. *Allen*, 927 S.W.2d at 887. Here, substantial evidence supported the trial court's determination that the car was marital property and subject to division between Husband and Wife. Accordingly, the trial court did not abuse its discretion in finding the car to be marital property.

The judgment is affirmed in part. The provisions of the dissolution decree for distribution of the two Mitsubishi Eclipse automobiles and payment of the debts thereon are reversed and remanded for further proceedings.

All concur.

---

4. Although the $20,000 transferred for the Kansas City duplex was originally a loan, Mr. Panettiere did nothing to collect it within the ten-year statute of limitations. In addition, the evidence would support the finding that he gave the funds to Husband and Wife when he told them to use the funds to increase their downpayment on their Lee's Summit residence.