**Wayne RANDOLPH,**
**Appellant/Respondent,**

v.

**Kathleen RANDOLPH,**
**Respondent/Appellant.**

**Nos. WD 56391, WD 56440.**

Missouri Court of Appeals,
Western District.

Nov. 30, 1999.

---

John Allinder, Independence, for appellent.

Dennis Owens, Kansas City, for respondent.

Before ALBERT A. RIEDERER, Presiding Judge, ROBERT G. ULRICH, Judge, and JOSEPH M. ELLIS, Judge.

RIEDERER, Presiding Judge.

Wayne Randolph appeals from a judgment issued by the Circuit Court of Jackson County, John I. Moran, J., in a dissolution of marriage action. Appellant argues that the trial court erred in finding that Vanessa Randolph, a child of the parties, was not emancipated, and that certain antique furniture be divided and given to each of the parties' children. Respondent, in her cross-appeal, argues that the trial court erred in awarding her only $187.27[1] per month in child support. We find that the parties' child was not emancipated, that the trial court was in error awarding part of the marital property to the parties' children, and that the record does not show how the trial court determined imputed income on Form 14.

Affirmed in part, reversed and remanded in part, with directions.

## Factual and Procedural History

The parties were married on August 18, 1973, and Vanessa, one of the parties' three children, was born on September 11, 1979. Sometime in 1996, when Vanessa was sixteen years old, she started dating a twenty-year old man. On October 12, 1996, a month after Vanessa turned seventeen, she and her mother, the Respondent, had an argument, and Vanessa ended up leaving home. At first, she stayed in a motel, and then she and her boyfriend stayed with his cousin and later with his mother. In April, Vanessa and the boyfriend rented an apartment together, and in May of 1997, Vanessa, then pregnant, returned home. Shortly thereafter, on May 7, 1997, Appellant father filed a petition for dissolution of marriage, and Respondent mother filed an answer later that month. In the same month, Respondent and Vanessa moved together to Louisiana.

On January 20, 1998, a hearing was held in the Circuit Court of Jackson County, and a judgment and decree of dissolution of marriage was entered on June 4, 1998. An amended judgment and decree of dissolution of marriage was filed on August 20, 1998. This appeal ensued.

## Standard of Review

In a dissolution of marriage case, the judgment of the trial court must be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re Marriage of Gerhard*, 985 S.W.2d 927, 930 (Mo.App. 1999). The appellate court defers to the trial court's determinations of credibility, viewing the evidence in the light most

---

1. This is the amount Respondent uses in her brief. However, the record indicates the amount is $187.62.

favorable to the decree and disregarding all contrary evidence and inferences. *Id.*

## I.

### A. Emancipation

■ Appellant argues in his first point that the trial court's finding that Vanessa Randolph, the parties' daughter, was not emancipated was against the weight of the evidence and erroneously applied the law.[2]

Appellant initially argues that Vanessa is emancipated and that he is therefore not obligated to pay child support for her because of the following provisions of Section 452.340.3:

> Unless the circumstances of the child manifestly dictate otherwise and the court specifically so provides the obligation of a parent to make child support payments shall terminate when the child . . . (4) becomes self-supporting, provided that the custodial parent has relinquished the child from parental control by express or implied consent[.]

However, this section manifestly does not apply to Appellant's case, for the acts by which Appellant claims Vanessa became self-supporting occurred before Appellant had any obligation to pay child support. By the time the parties separated and the petition of dissolution was filed, Vanessa had returned home. By the time of the hearing and judgment, Vanessa was living with and supported by Respondent. Nevertheless, we analyze whether under the case law, Vanessa had become emancipated before her parents separated and their marriage was dissolved.

Vanessa Randolph was born September 11, 1979. She was seventeen years old when Appellant filed his petition for dissolution of marriage on May 7, 1997. Sometime in 1996, Vanessa started dating a twenty-year old man, which made Appellant and Respondent uncomfortable. On or about October 12, 1996, Vanessa and Respondent had an argument. Respondent left the home and went to the store. When she returned, Vanessa had packed some belongings in plastic bags and left. That same evening Vanessa left, and Appellant and Respondent met with her at a Denny's Restaurant, at Vanessa's request, to try and resolve their problems. Appellant and Respondent both wanted to try to get Vanessa to come home. The meeting resulted in Vanessa returning to the family home. It appeared Vanessa may have decided to stay, but then, during a family fight that ensued at the home, Appellant slapped Vanessa, who then decided she was going to leave. Respondent gave Vanessa money to stay in a motel. Vanessa stayed at a motel with her boyfriend for three to four days. They moved in with the boyfriend's cousins for approximately three months, and then moved in with his mother for approximately six weeks, until the end of March 1997. The couple eventually got an apartment where they resided for approximately the month of April. During this time, Vanessa had quit school in February and worked at several different jobs. In May of 1997, Vanessa returned home. She was pregnant and in need of assistance for health insurance. During this same time, Appellant and Respondent were in the process of separating. Vanessa had been home for approximately a month when she moved to Louisiana with her mother. Respondent provided insurance for Vanessa and provided insurance for the birth of her child. Appellant argues that Vanessa is emancipated because at seventeen, she moved out of her parent's home, moved in with her boyfriend, quit school and worked at various jobs for approximately six months, before returning home when she became pregnant. Appellant appears to argue that since Vanessa left home for approximately six months she was emancipated. Appellant does not offer any other

2. This court recently decided *Smith v. Smith,* W.D. 56274, 1999 WL 968524 (October 26, 1999), which also had an emancipation issue. In that case, the parties did not dispute the finding of emancipation.

evidence to support his claim that Vanessa is emancipated, and cites one case, *Sparks v. Trantham,* 814 S.W.2d 621, 625 (Mo. App.1991) (quoting, *Rapplean v. Patterson,* 631 S.W.2d 693, 694 (Mo.App.1982)), for the proposition that "Relinquishment of parental control 'may be inferred from a child's attaining a status or position inconsistent with remaining subject to parental care and control and from such things as parental acquiescence in the child's working for others, receiving its pay therefor, and spending the money as it pleases.'" Appellant does not elaborate further or offer any other evidence on his claim of emancipation.

■ Emancipation has been defined as the "freeing of a child for all the period of its minority from the care, custody, control, and service of its parents; the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parent's legal obligation to support it." *Ragan v. Ragan,* 931 S.W.2d 888, 890 (Mo.App.1996) (citations omitted). Emancipation is never presumed, and the burden is upon the party asserting it to show facts proving the emancipation. *Id.* Thus, Appellant has the burden to prove that Vanessa is emancipated. Emancipation can be accomplished in one of three ways: (1) by express parental consent, (2) by implied parental consent, or (3) by a change of the child's status in the eyes of society. *Denton v. Sims,* 884 S.W.2d 86, 88 (Mo.App.1994). The third method is most often shown by the child entering the military or marrying. *Id.* However, it can also be shown "when a child who is physically and mentally able to care for herself voluntarily chooses to leave the parental home and attempts to 'fight the battle of life on [her] own account.'" *Id.* (quoting, *Specking v. Specking,* 528 S.W.2d 448, 451 (Mo.App. 1975)). Emancipation can only occur when a minor child is old enough to take care of and provide for herself. *Id.*

Neither Appellant nor Respondent ever expressly consented to the emancipation of Vanessa, nor does the evidence show they offered their implied consent. The night Vanessa left, both Appellant and Respondent met with Vanessa at Denny's and attempted to get her to return home. Vanessa did return home that evening, but left again when a family fight ended with Appellant slapping Vanessa. Respondent gave Vanessa money to stay in a motel, because Respondent did not want Vanessa to be without a place to stay. Appellant testified that he called legal counsel to determine if there was anything he could do legally to make Vanessa return home. Appellant testified that he did not want Vanessa to leave and that both he and Respondent did everything within their power to keep Vanessa from leaving. These actions are not consistent with consent, either express or implied.

Thus, emancipation could only occur if Vanessa's status changed in the eyes of society, an issue to which we now turn. During the approximately six months Vanessa lived away from home, she was transient. Vanessa and her boyfriend stayed at a motel for three to four days, paid for by Respondent. Then they moved in with the boyfriend's cousins for approximately three months, and with his mother for some six weeks after that, until the end of March. The couple eventually got an apartment, where they resided for about a month. Then Vanessa moved back to the family home where both parents still resided. A month later, Vanessa moved to Louisiana with Respondent. Vanessa's living arrangements during the time she lived away from home resembled that of a runaway more than a young adult trying to make it on her own. The circumstances surrounding her leaving also support that conclusion.

In addition, Vanessa received financial and emotional support from Respondent during her months away from home. Respondent testified that she supported Vanessa financially during this time. Respondent gave Vanessa money for groceries, car repairs and prenatal care. Re-

spondent also testified that within a week of the night Vanessa left, the family started counseling, as a result of Appellant slapping Vanessa in the face. Respondent testified that while in counseling, it was discovered that Appellant did not think he did anything wrong and that he would not have a problem hitting Vanessa again. Respondent testified that Vanessa told her that she wanted to come home, but she wanted Appellant to tell her that he would not hurt her again. Respondent also testified that Vanessa asked to return home at Thanksgiving and Christmas. On both occasions, Appellant let Vanessa come to the family gathering, but only as a guest. After Appellant became pregnant and asked to return home, Appellant told her she had to apologize for what she had done. Vanessa apologized and asked if she could please come home. Appellant then told her the family would have to take a vote. During the family meeting, Appellant told Vanessa that since he and Respondent were having problems and had not reached a settlement, she could not move home unless Respondent signed a piece of paper that stated she would not pursue child support for Vanessa.

Appellant has not met his burden to show that Vanessa is emancipated. The only evidence Appellant offered was that Vanessa left home, quit school and lived with her boyfriend for approximately six months. The record shows that Vanessa's living arrangements during the time she lived away from home were transient, that she received financial assistance and emotional support from Respondent, and that she contacted her family on several occasions and asked to return home. Further, based on the behavior of Appellant, there is reason to question the voluntariness of the length of time Vanessa lived away from home. She would likely have come home earlier if Appellant would have allowed it. Finally, the evidence in the record shows that Vanessa was not able to take care of and provide for herself and that she did not do so. She needed help from her parents, and Respondent provid-

ed it. These are not the actions of someone who voluntarily chooses to leave the parental home and attempts to fight battle of life on her own account. *Denton*, 884 S.W.2d at 88. Vanessa never attained a status inconsistent with remaining subject to parental care, *Sparks*, 814 S.W.2d at 625, and certainly did not have parental acquiescence. *Id.*

Appellant has asserted that the trial court's judgment is against the weight of the evidence. However, a review of this record demonstrates that there is ample evidence to support the conclusions and the judgment of the trial court. Appellant has also argued that the trial court erroneously applied the law. However, as the foregoing analysis demonstrates, the trial court correctly applied the law to the facts before it. The trial court was correct in its finding that Vanessa was not emancipated.

### B. Section 452.340.5

◼ As part of his first point on appeal, Appellant also argues that child support for Vanessa should have abated under Section 452.340.5. Appellant argues that since the parties' separation in May of 1997, Vanessa has taken one correspondence course. However, Respondent testified that Vanessa was enrolled in correspondence courses in May or June and that two weeks after she and Vanessa moved to Louisiana, Vanessa enrolled in summer school. In the Fall of 1997, Vanessa registered at Covington High School. She attended classes for a week when she was stricken with Bell's Palsy. She was then home-schooled by tutors from the public school system until January 1998. She then re-enrolled in Covington High School and was expected to graduate in May of 1998.

Section 452.340.5 states in pertinent part:

> If when a child reaches age eighteen, the child is enrolled in and attending a secondary school program of instruction,

the parental support obligation shall continue, if the child continues to attend and progresses toward completion of said program, until the child completes such program or reaches age twenty-one, whichever first occurs....

Section 452.340. 5 required Appellant's parental support obligation to continue, as long as Vanessa was enrolled in and attending a secondary school program of instruction when she reached eighteen and continued to attend and progress toward completion of a secondary school program, until she completed it or reached age twenty-one, whichever first occurred. "The words 'secondary school program of instruction' are broad and cannot be narrowly confined to a traditional 'high school.' 'Secondary school' is defined by Webster's Third New International Dictionary 2051 (1976), as 'a school more advanced in grade than an elementary school and offering general, technical, vocational, or college-preparatory courses.' " *In re Marriage of Copeland,* 850 S.W.2d 422, 425 (Mo.App.1993). Here, in the Fall of 1997, Vanessa enrolled in Covington High School. She attended classes for a week when she was stricken with Bell's Palsy. She was then home-schooled by tutors from the public school system until January 1998. She then continued in Covington High School and was expected to graduate in May of 1998. Although the record is slim on the specifics of the home-schooled tutorial program Vanessa was enrolled in during her illness, it appears from the record to be a program of instruction provided by the public school system as part of her being enrolled in a secondary school. Thus, we conclude that when Vanessa reached the age of eighteen, she was enrolled in and attending a secondary school program of instruction.

In *Copeland,* 850 S.W.2d at 425, the son was not attending a traditional high school but was enrolled in and attending the Adult Basic Education Program at the Cape Girardeau Area Vocational–Technical School. The program was an individual-ized, directed self-study program. The father argued that his son was not enrolled in a secondary school program of instruction under Section 452.340.5. The court in *Copeland* determined that the program was a secondary school program of instruction. *Id.* The court found that the son had enrolled in the program only four days after he dropped out of traditional high school, that he passed the high school equivalency test on his first attempt after eight months in the program, and had registered at a community college for the following fall. *Id.* at 424. On the other hand, in *Russell v. Russell,* 949 S.W.2d 87, 90 (Mo.App.1997), this court found that the son's home-study program in that case was not a secondary school of instruction. The *Russell* court distinguished its case from *Copeland.* In *Russell,* the son dropped out of high school at sixteen. The son attributed his dropping out to hanging out with the wrong crowd. The son testified that he did not consider his learning disability as a factor in his decision to drop-out. The son did not pursue educational endeavors for over two years, before enrolling in a home study GED program, the International Correspondence Schools, three months prior to his eighteenth birthday. There are fifteen courses in the program, and the son was taking the courses one at a time. The court in *Russell* determined that the evidence failed to show that the son's educational endeavors complied with Section 452.340.5. *Id.* The court in *Russell* stated that the conduct of the son "casts serious doubt on the seriousness and good faith efforts by Jonathon to continue his education." *Id.* The *Russell* court distinguished its case from *Copeland,* because the son in *Copeland* intended to continue his education and was making a good faith effort to do so. *Id.* Our case is guided by *Copeland.* Here, Vanessa dropped out of high school for only one semester. She was enrolled in and attending high school before she turned eighteen and prior to becoming ill. Vanessa did not take any time off during her illness and was home-schooled by tutors from the

public school system until she returned to Covington High School. Vanessa was expected to graduate in May of 1998. Her course of study was continuous except for the one semester where she had been a transient living with her boyfriend, and that occurred before the marriage dissolution action was filed. Since her return home, the evidence is that Vanessa pursued her education seriously. The evidence in the record suggests that Vanessa was making a good faith effort to continue her education despite her illness and that she intended on graduating. There is no evidence in the record to suggest that Vanessa was not making a good faith effort. Thus, there is ample evidence to support the trial court's judgment; and the judgment correctly applies the law to the facts of this case. Point I is denied.

## II.

Appellant argues in his second point that the trial court erred in awarding marital property to three children born of the marriage in that the trial court does not have jurisdiction to award marital property to third parties.

The trial court's amended judgment listed the antique furniture in question as marital property. With regard to the antique furniture, the amended judgment of the trial court stated:

> IT IS FURTHER ORDERED that the parties shall divide the antiques mentioned in the Court's finding in to three groups in a way that each group has a value of approximately $5,000.00. Each child shall receive one-third of the antiques. Robert Randolph shall receive his share of the antiques now and Petitioner and Respondent shall hold, in trust, the antiques to be received by the children in their custody and transfer the antiques to them when they become emancipated.

■ Appellant argues that the trial court did not have jurisdiction to distribute marital property to the parties' children. Respondent argues that the antique furni-

ture at issue should have been denominated by the trial court as her separate property, contending that the antique furniture was given to her by her grandparents as a gift. First, we must determine whether the trial court erred in finding that the antique furniture was marital property.

■ Section 452.330.1 states in pertinent part: "1. In a proceeding for dissolution of the marriage or legal separation, ... the court shall set apart to each spouse such spouse's nonmarital property and shall divide the marital property ... in such proportions as the court deems just after considering all relevant factors...." The five factors enumerated in Section 452.330 that the court is directed to consider are: (1) the economic circumstances of each spouse; (2) the contribution of each spouse to the procurement of the marital property; (3) the set-off of nonmarital property; (4) the parties' conduct during the marriage; and (5) the custodial arrangements for minor children. Section 452.330.3 states in pertinent part that "All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property ... The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section." However, Section 452.330.2 lists several exceptions to this presumption, including property "acquired by gift, bequest, devise, or descent[.]" The party questioning the presumption of marital property has the burden of rebutting the presumption by clear and convincing evidence. *Summerville v. Summerville*, 869 S.W.2d 79, 85 (Mo.App.1993).

■ Respondent claims that the antique furniture is her separate property, since it was allegedly given to her by her grandparents as a gift. But Respondent does not contest that the antique furniture was given to her during the marriage.

Thus, Respondent must rebut by clear and convincing evidence the presumption that the antique furniture is marital property. Clear and convincing evidence is evidence that "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Marriage of A.S.A.*, 931 S.W.2d 218, 222 (Mo.App.1996). The only evidence Respondent provides to rebut the marital property presumption is her testimony that the antique furniture was given to her alone. The trial court did not have to believe this testimony, particularly in the absence of any supporting evidence. The trial court therefore did not err in determining that the antique furniture is marital property. We must now determine whether the trial court erred in awarding the antique furniture to the parties' children.

Section 452.330.1 states that in a proceeding for dissolution of marriage: "the court shall set apart to each spouse such spouse's nonmarital property and shall divide the marital property...." Dissolution of marriage is a statutory action, unknown to the common law. *Cates v. Cates*, 819 S.W.2d 731, 734 (Mo.1991). The statutes relating to dissolution of marriage thus dictate the nature of the action, its breadth, the authority of the parties to agree, or the court to order, property settlement and support obligations and the manner in which decrees and agreements entered under the statute will be interpreted. *Id.* (citations omitted).

■ Here, the court ordered the parties to divide the antiques in to three groups, each group having a value of approximately $5,000.00, and ordered that each child was to receive one-third of the furniture. The court also ordered that one of the children would receive his share of the antiques now and that Appellant and Respondent were to hold the other two children's antiques in trust until they become emancipated. Section 452.330 gives the trial court broad power to divide and distribute marital property. *Panettiere v. Panettiere*, 945 S.W.2d 533, 541 (Mo.App. 1997). However, Section 452.330 does not give the trial court discretion to divide and distribute marital property to the children of the parties. *See Panettiere*, 945 S.W.2d at 540–41; *Tinger v. Tinger*, 709 S.W.2d 123, 124 (Mo.App.1986). It was error for the trial court to award the antique furniture to the parties children. Although some cases imply or state indirectly that the trial court may have the power to set aside property to a third party, a thorough review of the case law reveals no such authority. First, we note that Section 452.330 does not expressly authorize it; indeed, Section 452.330 appears to contemplate that any division of marital property shall be made to the spouses only. However, *Tinger v. Tinger*, 709 S.W.2d 123, 124 (Mo.App.1986), refers to the courts having broad powers to divide marital property either between the spouses or with third persons. *Tinger* cites *Goodding v. Goodding*, 677 S.W.2d 332, 339 (Mo.App. 1984) as authority. *Goodding* cites *Wilhoit v. Wilhoit*, 599 S.W.2d 74, 80 (Mo.App. 1980) as authority. None of these cases actually deal with the division of marital property to a third party. *Wilhoit* cites *Claunch v. Claunch*, 525 S.W.2d 788, 791 (Mo.App.1975) for this language, as well as *Corder v. Corder*, 546 S.W.2d 798, 805 (Mo.App.1977). However, neither of these latter cases deal with setting aside marital property to a third party, and, more importantly, a careful reading of both *Claunch* and *Corder* reveals that neither case makes any mention of this idea or proposition. Although there is authority for a trial court to order a property set off to a nonspouse third party who is made a party to the action, such is not the case here. However, we find no authority, either in Section 452.330 or in the case law, for the court to distribute marital property to a third party in this case. The trial court erred in setting aside $5,000.00 of antiques to each of the parties three children. The antique furniture should have been divided in a just and fair manner

between the husband and wife. The judgment, as it affects the antique furniture, is reversed and remanded for division of the antiques to the husband and wife in a just and fair manner.

### III.

 Respondent argues in her cross appeal that the trial court erred in awarding her only $187.62 per month in child support. She complains that the trial court abused its discretion by imputing only $4,540.00 additional income to Appellant beyond his pension. Respondent claims that based on Appellant's qualifications, experience and military background, he should have been earning as much as $60,000 per year. However, Respondent does not direct us to any evidence in the record that would support such a finding. We have scoured the record for any evidence that supports such a conclusion. Although Respondent does not couch her argument in such terms, she is really arguing that the trial court erred in arriving at the presumed correct child support amount. The trial court determined and found for the record the presumed child support amount. *Woolridge v. Woolridge*, 915 S.W.2d 372, 379 (Mo.App.1996). The trial court did not reject the presumed correct child support amount, and Respondent did not bring to the court's attention any deficiency in the amount calculated or the method of calculation. Respondent now claims on appeal that this amount is wrong. However, she did not produce any evidence on the issue and did not provide this court with any Form 14 that was before the court below. An award of child support is within the sound discretion of the trial court, and the court's award will not be disturbed unless there is insufficient evidence to support it. *Morris v. Morris*, 951 S.W.2d 739, 742 (Mo.App. 1997). We defer to the trial court's superior ability to view the witnesses and determine credibility. *Id.* The trial court is free to believe or disbelieve the testimony given by the witnesses. *Id.* Here, the testimony showed Appellant was able to work and

was looking for work. However, there is no evidence in the record on the issue of how much income Appellant would make in addition to his retirement pay. Therefore, when this case is remanded for division of the property, the court is directed to receive evidence on the issue of imputed income of the Appellant and to determine child support, under *Woolridge*, accordingly. Point III is sustained and the child support award is reversed.

Judgment affirmed in part, reversed and remanded in part.

ROBERT G. ULRICH, Judge, and JOSEPH M. ELLIS, Judge, concur.