Leonard O'BRIEN, Plaintiff-Respondent,

v.

Mary N. WADE, Defendant-Appellant.

No. 36920.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Aug. 17, 1976.

Murray Stone, St. Louis, for defendant-appellant.

Ziercher, Tzinberg, Human & Michenfelder, Gerald T. Ortbals, Clayton, for plaintiff-respondent.

NORWIN D. HOUSER, Special Judge.

This is the saga of the female Labrador dog named Zein. This is the third court which has considered the troubles involving Zein since 1970. In that year Leonard O'Brien filed a 2-count suit against Mary N. Wade in the Magistrate Court of St. Louis County for (1) damages for breach of contract to deliver registration papers for Zein, and (2) actual and punitive damages for fraudulent representation that Zein had been obedience- and field-trained. After one change of venue and nine continuances the case was tried, resulting in a judgment for Wade. O'Brien appealed to the circuit court. At the conclusion of the trial in that forum O'Brien dismissed Count II, received permission of the court to amend the petition by pleading breach of implied warranty of fitness of the dog for use as a retriever, and went to the jury under Instruction No. 2 on implied warranty of suitability and Instruction No. 4 on breach of contract to deliver pedigree papers. The jury found the issues for O'Brien and assessed his damages at $2,000. Wade has taken a timely appeal to this Court. She contends that the verdict is excessive; that the court erred in permitting O'Brien to recover as consequential damages the boarding fees for the dog from the date of purchase to date of trial (4½ years) because he made no effort to minimize the damages by disposing of the dog within a reasonable time after he was informed that Wade would not rescind the contract; that O'Brien, having elected to recover on breach of warranty, was entitled to judgment only for the purchase price of the dog, less its market value at the time Wade refused to take it back and return his money, plus any consequential damages for dog care for a reasonable time within which O'Brien could have disposed of Zein by destruction, sale or gift.

There was evidence from which the jury could have found these facts: In April, 1970 O'Brien, desiring to purchase a hunting dog, read this ad in the Post-Dispatch: "Labrador retriever, female, black, ready to breed, obedience trained, field trained, loves children, must sell because of sickness to [of?] owner, $300.00 to duck hunter. Post Office Box 109, Post-Dispatch." Responding to the ad, he received Mary N. Wade's telephone number. She told O'Brien over the telephone that the dog had complete obedience and field training; that it had been flown to New York and Canada for training at a cost of $1,100.00; that the dog had a bloodline and pedigree papers and that she would give him the papers. Relying on the newspaper ad and the telephone conversation O'Brien bought the dog on May 10, 1970, and gave Wade a check for $300. There was an express oral understanding that O'Brien was to receive the papers on the dog. O'Brien did not get a bill of sale from Wade. Arrangements were made for O'Brien to pick up Zein on May 20, at which time Wade indicated she had found the papers and they would be mailed to O'Brien. O'Brien took Zein to Innisfree Kennels at St. Charles on May 24, 1970 and there arranged with Mr. Stolle, the opera-

tor, for maintenance of Zein. Mr. Stolle knew Zein, since Wade had brought Zein to Mr. Stolle on February 8, 1970 for obedience training, at which time Wade told him that Zein had been field trained. Mr. Stolle gave her obedience training for six weeks, then took her into the field for two weeks. It was his opinion that Zein had had no prior training. Zein was very shy. She would go into the water but she was slow to go into the water. Zein was not an aggressive hunting dog. Labradors have to hit the water with great eagerness.

Not having received the papers by mail O'Brien made repeated unsuccessful attempts to get in touch with Wade by telephone. Ultimately he contacted her and she promised he would get the papers. Two weeks after O'Brien bought the dog he sent Wade this telegram: "Remit register paper or check by Wednesday." In response O'Brien received a telegram from Wade's husband stating that his wife was out of town; that no papers would be given, no check returned, and that any annoyance to him or his children would be "severely dealt with." When it became clear that the papers would not be forthcoming O'Brien repeatedly proposed to Wade that he bring the dog back and receive the money in return. The response was that Wade was not going to deliver the papers or return the money. After O'Brien was told that the check would not be returned he considered destroying the dog "but it was against [his] nature." O'Brien also considered giving the dog to some family or keeping the dog himself. O'Brien left the dog at Innisfree Kennels, where it was maintained at O'Brien's cost and expense from May 24, 1970 to date of trial beginning November 14, 1974. O'Brien never went duck hunting with Zein. O'Brien tried to sell the dog, but received no offers. Zein could have been sold for $50 without papers. Although she could have been bred her puppies would have been worthless without papers. For feed, daily exercise and medical care the kennel charged O'Brien $1.50 a day at first. At time of trial the daily fee had been raised to $2.50. O'Brien paid kennel bills as they came due.

Counting boarding and vet bills the charges for Zein totalled $3,257.25.

 Dog lovers will applaud O'Brien's tenderhearted rejection of the possibility of destroying Zein upon learning that Wade would not agree to a rescission of the contract, but the law will not allow O'Brien credit for Zein's 4½-year board bill. In *Blair v. Hall,* 201 S.W. 945 (Mo.App.1918), in an action for breach of warranty in the sale of a cow warranted to be a regular breeder but found worthless for that purpose, being a "shy breeder" and of small value in comparison for beef purposes, it was held that in such case the purchaser has the choice of remedies, to retain the animal and sue for damages, or tender it back and sue for the purchase price. Where the animal has some value the recovery, of course, must be diminished to that extent, and where the tender is refused the purchaser is entitled to recover for the keep of the animal for a reasonable length of time after discovering the breach of warranty. "On the breach of a warranty made on the sale of an animal, the expense of the animal's keep may be recovered by the buyer up to the time the breach became definitely known, * * *. Where a tender is refused, the buyer is entitled to compensation for the keep of the animal for a reasonable time for the purpose of resale, * *." 77 C.J.S. Sales § 378, p. 1327. However, "[o]ne cannot voluntarily keep and use worthless property with knowledge of its being worthless and thereby multiply damages or expenses chargeable to the vendor." *Walls v. Tinsley,* 187 Mo.App. 462, 173 S.W. 19, 21[5] (1915), involving a jack which was "a very poor breeder, * * * of little, if any, value for that or any other purpose." When the purchaser discovers the uselessness of incurring expenses to keep an animal which does not live up to the warranty he may not recover for keeping the animal. *Hudgings v. Burge,* 194 S.W. 886, 887[7] (Mo.App.1917). These decisions, which predate the Uniform Commercial Code, Ch. 400, RSMo 1969, are consistent with the code, which provides that where the buyer rightfully rejects or justifiably revokes ac-

ceptance the buyer may cancel[1] and recover from the seller the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages[2] provided for in § 400.2–715. Incidental damages include expenses reasonably incurred in care and custody of goods rightfully rejected and any reasonable expense incident to the breach. Consequential damages include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know "and which could not reasonably be prevented * * *."

Zein was not suitable for the intended use. Wade breached the implied warranty of suitability and the express warranty to deliver pedigree papers. Purchaser O'Brien was justified in tendering rescission. Seller Wade having refused the tender O'Brien definitely knew on May 24, 1970 that there was a breach of contract. At that time, under the Uniform Commercial Code and the foregoing decisions, O'Brien was entitled to recover the difference between the purchase price ($300) and the market value of Zein ($50) plus incidental damages for the keep of Zein for a reasonable time, say 60 days, after May 24, 1970, at the rate of $1.50 per day ($90), for a total of $340, and no more.

Wade's other contentions on this appeal relate to the giving of Instruction No. 2[3] and Instruction No. 4.[4]

Wade argues that it was error to give both No. 2 on implied warranty and No. 4

on breach of contract "when all of plaintiff's evidence pertained only to the breach of an express bilateral contract." She claims that only No. 4 should have been given; that there was no evidence of any implied warranty of suitability.

■ It is true that the case on Count I, as pleaded, was for damages for breach of an express contract to deliver to O'Brien registration papers on the dog. It is not true, as Wade claims, that "plaintiff bases his entire case on the breach of the contract by the defendant failing to deliver registration papers for the dog," or that there was no evidence presented by the plaintiff on the question of implied warranty. O'Brien testified that he wanted a dog for hunting purposes; that he was a duck hunter "to some extent," having gone out duck hunting four or five times with friends who had a dog, and that he then decided to buy a dog. The newspaper ad itself, in its reference to "duck hunter," "obedience trained" and "field trained," constituted an implied warranty that Zein was trained to retrieve ducks. In the first telephone conversation between the parties Wade told O'Brien the dog had "complete" training, both obedience training and field training, indeed "excessive training," both in New York and Canada. O'Brien testified that the newspaper ad "mentioned to duck hunters," and that the Wades were concerned about getting a good home for Zein "and someone who would use it for duck hunting." There was sufficient evidence for the jury to find that there was an implied warranty that Zein was fit and suitable for duck hunting, but that she did not have the aggressive

---

1. § 400.2–711(1).

2. § 400.2–713.

3. "Your verdict must be for Plaintiff if you believe:
 "First, Defendant sold a Labrador Retriever dog to Plaintiff, and
 "Second, the Defendant knew or should have known by using ordinary care of the use for which Plaintiff purchased the Labrador Retriever dog, and
 "Third, Plaintiff reasonably relied upon Defendant's judgment as to the suitability of the Labrador Retriever dog for such use, and

"Fourth, the Labrador Retriever dog was not suitable for such use, and
 "Fifth, as a direct result Plaintiff was damaged." (MAI 25.03)

4. "Your verdict must be for Plaintiff if you believe:
 "First, Defendant did not deliver the pedigree papers of the Labrador Retriever dog to Plaintiff, and
 "Second, because of such failure, Defendant's contract obligations were not substantially performed, and
 "Third, Plaintiff was thereby damaged." (MAI 26.02)

zeal to plunge into cold water to retrieve, as required of a Labrador retriever in duck hunting. All of this evidence came in without objection, and the court, at the conclusion of the trial, properly granted leave to amend the petition to conform to the evidence to allege breach of implied warranty of fitness for the purpose of duck hunting, and properly instructed on that issue.

 Citing *Hunt v. Sanders,* 313 Mo. 169, 281 S.W. 422 (1926), and *Mullins v. Sam Scism Motors, Inc.,* 331 S.W.2d 185 (Mo. App.1960), Wade contends that O'Brien, as the buyer of a chattel as to which an express warranty given by the seller has been breached, has no choice between suing for breach of that warranty or breach of an implied warranty; that plaintiff in such case cannot have both, because the express warranty as to the particulars included within its terms excludes an implied warranty. These cases, decided before the enactment of the Uniform Commercial Code, do not support Wade's argument. The exclusion of an implied warranty about which they speak is an exclusion as to the particulars included within the terms of an express warranty. They are talking about express and implied warranties as to the same quality or characteristic, not as to different qualities or characteristics. An express warranty that pedigree papers will be furnished does not exclude an implied warranty that a dog is field trained for duck hunting. There is no inconsistency between the two warranties. An express warranty and an implied warranty can exist together in a contract of sale when not inconsistent. *Boulware v. Victor Automobile Mfg. Co.,* 152 Mo.App. 567, 134 S.W. 7 (1911). An express warranty does not exclude an implied warranty about other matters, *Alvin Fruit & Truck Ass'n v. Hartman,* 146 Mo. App. 155, 123 S.W. 957 (1909), or matters disconnected with the express warranty. *International Pavement Co. v. Smith, Beggs & Ranken Mach. Co.,* 17 Mo.App. 264 (1885). The Uniform Commercial Code has not abrogated but is entirely consistent with these holdings. It provides in § 400.2–317 that "Warranties whether express or implied shall be construed as consistent with each other and as cumulative * * *." There is no inconsistency, but if there had been this implied warranty would have been saved by the Uniform Commercial Code provision that "Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."

Accordingly, the judgment for plaintiff and against defendant is affirmed on the issue of liability, and reversed on the amount of the judgment, and the cause is remanded with directions to enter a new judgment as of November 15, 1974 in the amount of $340.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.