560 F.Supp. 583 (1983)
LARRY GOAD AND COMPANY, a Missouri Corporation, Plaintiff,
v.
LORDSTOWN RUBBER COMPANY, an Ohio Corporation, Defendant.
No. 82-369C(2).
United States District Court, E.D. Missouri, E.D.
March 28, 1983.
*584 William Ohlhausen, St. Louis, Mo., for plaintiff.
Leo J. Kelly, Pittsburgh, Pa., Robert F. Schlafly, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, District Judge.
Plaintiff, Larry Goad and Company, brought this cause of action pursuant to 28 U.S.C. S 1332, to recover damages resulting from the purchase of defective rubber. The plaintiff contends that it is entitled to be reimbursed for the labor and material costs expended during its unsuccessful attempt to line two tanks with the rubber supplied by the defendant. The plaintiff's theories of recovery are breach of implied warranty of merchantability, and breach of implied warranty for a particular purpose. The defendant has counterclaimed for the purchase price of certain of the rubber shipped to Larry Goad and Company, for which the plaintiff admittedly has not paid.
This case was tried to the court sitting without a jury. The court having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. Plaintiff, Larry Goad and Company (hereinafter "Goad"), is a Missouri corporation with its principal place of business in St. Louis County, Missouri.
2. Defendant, Lordstown Rubber Company (hereinafter "Lordstown"), is an Ohio Corporation with its principal place of business in Ohio.
*585 3. The matter in controversy herein exceeds the sum of $10,000 exclusive of interest and costs, and is between citizens of different states. This court has jurisdiction pursuant to 28 U.S.C. § 1332.
4. Lordstown is in the business of selling rubber lining material for use in lining vessels.
5. Goad purchased Lordstown's rubber for use in lining two tanks for Monsanto Company. Plaintiff had two separate contracts with Monsanto, one a contract for $37,800 to rubber line a 25 foot closed tank, and the other a contract for $69,700 to line an open 40 foot tank. Both tanks were located at the Krummerich Plant in Sauget, Illinois.
6. At the time of the sale of this rubber, Lordstown was notified and knew of the particular purpose for which Goad was purchasing its rubber, and warranted to Goad that its rubber was of merchantable quality and fit for Goad's purpose.
7. During 1981, Lordstown sold and delivered to Goad various rubber and related products at prices which Goad agreed to pay. The following is an accurate listing of such products and prices:

 DATE AMT.OF
INVOICE NO. DESCRIPTION SHIPPED INVOICE
TL-810-2 1/4" LR-662- 7/15/81 $ 2,833.92
 1VA, 6 rolls
TL-849 LR-192-3C, 27 7/22/81 11,340.00
 rolls + 1 roll
TL-834 LR-192-3C, 18 7/31/81 8,070.00
 rolls, 3,228
 Sq. Ft.
TL-834 1/4" LR-561- 7/31/81 482.00
 1VA, 1 roll
TL-839 3/16" LR-662- 8/10/81 964.80
 1VA, 2 rolls
TL-839 3/16" LR-662- 8/10/81 522.00
 2VA, 1 roll
TL-894 3/16" LR-662- 9/16/81 6,615.00
 1VA, 15 rolls
TL-894 LR-192-3C, 17 9/16/81 7,650.00
 rolls
TL-953 3/16" LR-662- 11/13/81 482.40
 1VA, 1 roll

8. The total charge for this material was $38,960.52, of which Goad has paid $11,900.52, leaving a balance of $27,060.00 in unpaid invoices.
9. In addition to the above materials, Lordstown shipped Goad 42 rolls of rubber containing 7,630 square feet of LR-192-3C rubber lining stock on October 28, 1981; October 31, 1981 and November 11, 1981. The invoices accompanying said shipments bore the notation "N/C" (no charge).
10. On July 13, 1981 Goad began preparing the first of the two tanks, the 25 foot diameter tank, for lining.
11. After Goad sandblasted, primed and glued the tank, a strike resulted in a two week delay in work, prior to the application of the rubber lining.
12. On August 25, 1981, after Goad completed the lining, Monsanto's inspector, Mr. Ellerbush rejected the lining of the 25 foot tank and found it unacceptable. The evidence established that the problems were caused by poor application procedures, rather than any blemished or defective rubber. Therefore, the plaintiff agreed to redo the tank at its own expense at this time. Goad then called Lordstown and ordered 17 more rolls of LR-192-3C rubber, at its own cost, for relining the small tank. The rubber was shipped on September 16, 1981. Between August 25, 1981 and October 6, 1981, Goad removed the rubber from the small tank except from the roof, and repeated the sandblasting and priming of the tank. Goad was ready to begin to reline the 25 foot tank on October 6, 1981.
13. On October 6, 1981 Goad began to reline the first tank. During the commencement of the relining, Goad's employees questioned the quality of the lining material and called their supervisor, Mr. Ficker, so that they might determine how to proceed. Their supervisor advised them to shut down the job until the questions concerning the rubber were resolved.
14. On October 8, 1981, Mr. Ficker telephoned Lordstown's sales representative, Mr. Neidy, to advise him that the rubber lining material was of questionable quality. On October 12, 1981 Mr. Neidy came to St. Louis for the purpose of inspecting samples of the rubber at the Goad plant and Monsanto job site. Mr. Neidy took two samples of rubber with him for the purpose of testing, *586 and advised Goad to pick out the best appearing rubber and use it for the relining on the small tank.
15. Pursuant to these instructions, Goad continued to reline the first tank through October 21, 1981. On October 22, Monsanto again rejected the lining as being unacceptable. At this time, Goad returned all the existing stock of the suspect rubber to Lordstown for testing.
16. On October 28, 1981 Lordstown shipped Goad 15 rolls of replacement rubber, another 15 rolls were shipped on October 30, 1981. The final 12 rolls of the replacement rubber were shipped by Lordstown to Goad on November 11, 1981. The quality of the replacement rubber was never questioned.
17. On November 9, 1981 Goad returned the remaining stocks of the initial shipment of rubber to Lordstown. The plaintiff had ordered originally 83 rolls of rubber. 20 rolls were used in the first lining of the tank and were paid for by Goad. The remaining rolls were returned to Lordstown.
18. Between October 22, 1981 and November 23, 1981 Goad again restripped, reprimed and reglued the small tank. On November 23, 1981 Goad was ready to begin to line the tank. However, on this date Monsanto ordered Goad to stop its work on the small tank. Monsanto informed the Goad employees, due to delays in completing the two tanks, Goad would have to agree to a written timetable for the completion of the 40 foot tank, the second tank. It is clear that a substantial amount of the delay in lining the first tank was due to poor quality rubber.
19. Goad had begun its work on the forty foot tank in September of 1981. Preliminary work was performed on the 40 foot tank during the months of September, October and part of November, preparatory to installing the lining in that tank.
20. On November 24, 1981 Goad met at the job site with Monsanto. Monsanto complained about delays in completing the two tanks.
21. On December 1, 1981 Monsanto directed Goad to discontinue all work at the job site and on the following date, Monsanto cancelled its contract with Goad and directed Goad to leave the job site.
22. Upon termination, Monsanto asked Goad to submit a bill for the value of Goad's work for which Monsanto had not paid. Curtis Goad determined that the amount was $15,773.00. However, Goad determined that it would not accept this money from Monsanto. Up to this point in time, Monsanto paid Goad $17,425.00 for the value of its services on the two contracts.
23. During 1981, the plaintiff ordered a total of 83 rolls of rubber over the course of its dealings with the defendant. Twenty of the rolls were used in the first lining of the small tank. These were the only rolls of rubber for which Goad has paid. Of the remaining 63 rolls, Goad used ten in its second attempt to reline the small tank and returned the remaining 53 to Lordstown. Lordstown shipped 42 rolls of new rubber to Goad in replacement of the original order. Goad never questioned the quality of this rubber and it has kept and used these 42 rolls for its own use. The full value of all the material delivered was $415.00 per roll.
24. Goad's costs expended on materials for the Monsanto project amounted to $28,107.93, in addition to the amount expended on the rubber lining material. Approximately $6,129.68 of this amount was expended upon lining the small tank the first time.
25. Mr. Goad testified at trial that approximately $40,000.00 was expended on labor at the Monsanto project as a result of the defective rubber. Therefore, the plaintiff's total labor charges and material charges expended for the period beginning with the second lining of the small tank through the termination of the contract on December 2, 1981 equaled $61,978.25. This amount does not include the money expended on the rubber lining materials. These expenses were reasonably incurred by Goad in its attempt to complete its contract with Monsanto.

*587 CONCLUSIONS OF LAW
This court has jurisdiction of this case pursuant to 28 U.S.C. § 1332. Plaintiff claims it is entitled to be reimbursed for its labor and material cost expended during its unsuccessful attempts to line two tanks with rubber supplied by the defendant, in addition to the difference between the value of the rubber accepted and the value it would have been if it had been as warranted. The plaintiff contends that it incurred these expenses as a direct result of the defective rubber sold by the defendant. Therefore, the issue presented by this case is whether these damages were proximately caused by the defendant's breach of implied warrant of merchantability and implied warranty of fitness, and the extent to which any judgment awarded to the plaintiff should be offset by monies owed to the defendant for the rubber supplied to the plaintiff.
The Uniform Commercial Code, adopted under Missouri law implies warranties for contracts for the sale of goods by merchants. Section 400.2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale." In order for goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." Mo.Rev.Stat. § 400.2-314(2)(b). Section 400.2-315 provides for an additional implied warranty "[w]here the seller at the time of contracting has reason to know any particular purpose for which goods are required and that the buyer is relying on the seller's skill on judgment to select or furnish suitable goods...." In addition to providing for the existence of implied warranties, the Code specifies the measure of damages in the event of breach: [t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. In a proper case any incidental and consequential damages under section 400.2-715 may also be recovered." Mo.Rev.Stat. § 400.2-714(2) and (3). The Missouri courts have defined incidental damages as "expenses reasonably incurred in care and custody of goods rightfully rejected and any reasonable expense incident to the breach," and consequential damages as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented." O'Brien v. Wade, 540 S.W.2d 603, 606 (Mo.App.1976). Therefore, under Missouri law a buyer may recover for economic loss resulting from the sale of unmerchantable product if the loss is proximately caused by the breach and the buyer had in good faith mitigated his damages. Groppel Co. v. U.S. Gypsum Co., 616 S.W.2d 49, 59 (Mo.App.1981).
Applying this principle to the facts of this case, it must be concluded that the defendant breached the implied warranty of merchantability and the implied warranty of fitness by selling defective rubber to the plaintiff. The parties stipulated, that at the time of sale, Lordstown was notified and knew of the particular purpose for which its rubber was purchased and warranted to the plaintiff that its rubber was of merchantable quality and fit for Goad's purpose. See Findings of Fact No. 6. Therefore, the only question remaining is the approximate measure of damages.
Under Missouri law, the appropriate measure of damages for breach of warranty is the difference between the value of rubber accepted and the value the rubber would have been if it had been as warranted, in addition to incidental and consequential damages proximately caused by the breach. Mo.Rev.Stat. § 400.2-714. The defendant delivered to the plaintiff 83 rolls of rubber over the course of its dealing with the defendant in 1981 at $415.00 per roll. The plaintiff paid for 20 rolls of this rubber which were used for the first lining of the small tank; the evidence established that the quality of these rolls was not defective. See Findings of Fact Nos. 11 and 21. The plaintiff has failed to pay for the additional 63 rolls which amounts to $26,145.00. 53 of *588 those rolls were returned to the defendant and exchanged for 42 rolls of new rubber. Therefore, Goad is credited with 11 rolls of rubber which were returned and not replaced which amounts to a credit of $4,565.00. See Findings of Fact Nos. 15 and 16. In addition, Goad is entitled to an additional credit of 10 rolls of the defective rubber not returned in the amount of $4,150.00 as a result of its defective quality. See Findings of Fact No. 13. These credits resulting from the defendant's breach of warranty reduce the amount owed to the defendant for the rubber it supplied to the plaintiff to $17,430.00.
In addition to allowing a buyer the difference between the value of the materials accepted and the value the materials would have been if they were delivered as warranted, Missouri law allows a buyer incidental and consequential damages proximately caused by the breach. Mo.Rev.Stat. §§ 400.2-714, 400.2-715.[1] It is clear from the record that the defendant knew the purposes for which the plaintiff was acquiring the rubber. Furthermore, the plaintiff reasonably incurred expenses for materials and labor in its attempt to complete its contracts with Monsanto. See Findings of Fact Nos. 23 and 24. Plaintiff's inability to complete these contracts and as a result the incurring of these expenses was due largely to delay resulting from the supply of rubber. See Findings of Fact Nos. 13-17. Therefore, the plaintiff will be awarded its reasonable expenses in the amount of $61,978.25. However, under Missouri law a duty rests upon a buyer to mitigate its damages in good faith. Groppel Co. v. U.S. Gypsum Co., 616 S.W.2d at 59. The record establishes that Monsanto offered to pay Goad for the value of its work upon cancellation of the contracts. Mr. Goad approximated at trial that $15,773.00 would have been an appropriate amount for Monsanto to pay at that time. Furthermore, the record indicated that Monsanto had already paid Goad $17,425.00 for its work on the tanks. See Findings of Fact No. 21. It is the conclusion of this court that these amounts must be subtracted from the plaintiff's total recovery. The plaintiff failed to mitigate its damages by not accepting the money offered by Monsanto. Furthermore, unless the amount already paid to Goad is not subtracted from the award, the plaintiff will be receiving a double recovery. Finally, the defendant is entitled to a judgment of $17,430.00 on its counterclaim.
Accordingly, judgment will be entered for the plaintiff on the complaint in the amount of $28,780.25, and judgment will be entered for the defendant on the counterclaim in the amount of $17,430.00.
NOTES
[1] In its pretrial brief, the defendant contended that Lordstown limited its implied warranties to a refund of the net purchase price of the material proved to be defective by language in its Applicator's Manual. There was no evidence at trial establishing that this language was ever brought to the attention of the plaintiff, or that it was within Goad's knowledge at the time the parties entered into the contract. Furthermore, the defendant failed to brief this question in its posttrial materials. Due to the fact that there was no evidence presented on this question at trial, it is the conclusion of this court that the limitation of liability was ineffective.