**GENERAL ELECTRIC CAPITAL CORP., Plaintiff,**

**v.**

**Thomas RAUCH d/b/a Quality House Printing, Defendant/Third Party Plaintiff–Respondent,**

**v.**

**Carl TEMPLETON d/b/a Midwest Office Systems and Templeton's, Inc., Third Party DefendantsAppellants.**

**No. 21741.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 19, 1998.

William Petrus, Springfield, for Appellant.

J. Kevin Checkett, Checkett & Pauly, P.C., Carthage, for Respondent.

BARNEY, Judge.

Carl Templeton and Templeton's Inc. d/b/a Midwest Office Systems, Third Party Defendants (Sellers), appeal from the trial court's judgment awarding $128,434.00 in damages to Thomas Rauch d/b/a Quality House Printing, Third Party Plaintiff (Buyer). *See* Rule 52.11, Missouri Court Rules (1992).

The judgment relates to claims made by Buyer in Counts I and II of his petition against Sellers for breach of warranty and negligent misrepresentation, respectively, in connection with Sellers' activities as vendor or "supplier" of equipment for two equipment leases between Buyer and Lease America Corporation, predecessor in interest to General Electric Capital Corporation.

In reviewing the facts, we do so in the light most favorable to the judgment. *Gibson v. Adams*, 946 S.W.2d 796, 799 (Mo.App.1997).

This suit was initiated in August 1992, by General Electric Capital Corporation against Buyer for breach of the two equipment leases. The first lease, signed March 20, 1991,

consisted of a computer system and related hardware and software, referred to as "front end" equipment. The second lease, signed April 18, 1991, related to a "Birmy 300 Imagesetter." As more fully explained below, soon after executing the second lease, Buyer became dissatisfied with the output performance of the combined package of equipment. Buyer then refused to make payments in accordance with the terms of the two leases and this suit followed. We glean from the record that General Electric Capital Corporation obtained a consent judgment against Buyer based on a settlement price of $73,834.00.[1]

Buyer has operated its printing business in Aurora, Lawrence County, Missouri, for approximately twenty years. Buyer publishes various maps, directories and other printed products. Prior to 1991, in preparing to print these various publications Buyer would hand cut and paste up art work. He then sought to speed up the process so as to "set type fast," particularly in the preparation of high school directories. Consequently, Buyer decided to employ a computer typesetting system to automate this process.

Seller Carl Templeton is the Vice President of Midwest Office Systems and an officer in Templeton's, Inc., owner of Midwest Office Systems, located in Springfield, Missouri. In 1990 or 1991, Seller Carl Templeton met with Buyer and discussed the purchase of a system Buyer needed to automate his printing process. Buyer showed Seller Carl Templeton the kind of materials and directories he needed to publish. The equipment was to replace Buyer's process of hand cutting images with the automation of a modernized printing program.

With the new system, there would be a "stripping" program which would place the pages on the appropriate places to be set on a press sheet. It was anticipated that Buyer would be able to get a disk from its customers, scan the logos, and place them on the press sheet.

Buyer subsequently entered into two leases with Lease America Corporation, the predecessor in interest to General Electric Capital Corporation, through the assistance of Sellers as supplier of the equipment.

The first lease was for a front end computer system and attendant hardware/software, and the second lease provided for a Birmy 300 Imagesetter.

Buyer informed Seller Carl Templeton that he would not enter into the two leases unless Sellers provided Buyer with "some sort of guarantee that it's (the Birmy 300) going to work."

Seller Carl Templeton then delivered to Buyer a letter, dated April 25, 1991, on Midwest Office Systems' stationery, which recited that Sellers would "pick up" the Birmy 300 and continue to make Buyer's lease payments if the imagesetter failed to perform as warranted. Upon receipt of this letter, Buyer signed the second lease agreement.[2]

After the Birmy 300 Imagesetter was delivered and installed, Buyer attempted to output its printing process. However, the system failed to function properly. Consequently, Buyer was unable to complete his 1991 High School Coaches' Directory using the Birmy 300 Imagesetter. Instead, Buyer had to rely on his standard, labor intensive method to make production.

Eventually, Buyer acquired a BridgIt imaging system that he used in conjunction with the front end equipment provided by the first lease agreement, as augmented by a

---

1. The 1st lease related to the "front end" computer system. The terms of payment under this lease were as follows: Buyer was obligated to make 6 payments at $245.40 per month and 54 payments at $660.13 per month. The sum of the projected payments under the 1st lease was $37,119.42.

The 2nd lease related to the Birmy 300 Imagesetter. The terms of payment under this lease were as follows: Buyer was obligated to make 6 payments at $391.00 per month and 54 payments at $1051.79 per month. The sum of Buyer's projected payments under the 2nd lease was $59,142.66. The total projected payments under both leases amounted to $96,262.08.

2. It is undisputed that Buyer and Seller Carl Templeton had discussions concerning the "guarantee" relating to the Birmy 300 Imagesetter prior to Buyer entering into the first of the two leases. The letter was physically provided by Seller Carl Templeton to Buyer after Buyer had already signed the first of the two leases.

Macintosh computer seasonally provided by Sellers free of charge.[3] Nevertheless, as a consequence of his difficulties with the Birmy 300 Imagesetter, Buyer refused to make payments under both leases and this litigation ensued.

In the trial court's judgment, it specifically found that Sellers breached "express warranties" as to the "fitness of the computer and [Birmy 300] imaging system" and "negligently misrepresent[ed]" the leased equipment's performance ability, per counts I and II of Buyer's petition. The trial court entered its judgment[4] assessing damages against both Carl Templeton, individually, and Templeton's Inc., as follows:

| | |
|---|---|
| Settlement with G.E. for Lease of Typesetting System | $ 73,834.00 |
| Portion of Electrical Wiring | $ 2,500.00 |
| Rental of BridgIt Temporary System | $ 11,100.00 |
| Tom Rauch Stripping Time | $ 20,000.00 |
| Tammi Mattox Extra Typesetting Time | $ 21,000.00 |
| | $128,434.00 |

On appeal, Sellers assign five points of trial court error. First, Sellers maintain that the trial court erred in entering judgment for breach of warranty against Seller Carl Templeton in his individual capacity. Second, they maintain that there was insufficient evidence supporting the trial court's judgment against Sellers for the purported negligent misrepresentation made by Seller Carl Templeton to Buyer relating to the performance of the Birmy 300 Imagesetter. Third, they maintain that the trial court erred in entering judgment against Sellers on Buyer's breach of express and implied warranties claims because it was not supported by the evidence. Fourth, they maintain that the trial court erred in determining what constituted Buyer's damages for the purported breach of warranty by Sellers. Fifth, they maintain that the trial court erred in determining what constituted Buyer's damages for the alleged negligent misrepresentation by Carl Templeton.

◼ Our review of the record convinces us that Sellers and Buyer entered into a commercial transaction wherein Sellers made certain warranties and representations to Buyer concerning the equipment comprising the two leases in question. *See* § 400.1–102(3);[5] *Central Prod. Credit Assoc. v. Hopkins*, 810 S.W.2d 108, 114 (Mo.App.1991); 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 13–3, at 5 (4th ed.1995).

In our review of the law in this area, the weight of the authority appears to hold that "[t]he use of the term 'transaction' rather than 'sale' in UCC § 2–102 makes it clear that Article 2 [Sales] is not to be confined merely to those transactions in which there is a 'sale,' that is, a transfer of title." 1A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–102:6, at 521 (3rd ed.1996).

In their respective briefs, Sellers and Buyer acknowledge having entered into a commercial transaction as vendors and vendee for the "purchase" of equipment, even though, technically, title never passed from Sellers to Buyer. In apparent recognition of the Sellers and Buyer's relationship as vendors/vendee, the two equipment leases in

---

**3.** Buyer testified that the monthly rental on the BridgIt imaging system was $925.00 per month for a 12 month period.

**4.** Sellers made no motion for an election of remedies. We make no determination as to whether Buyer should have been required to elect between his two theories of recovery. *See generally Whittom v. Alexander–Richardson Partnership*, 851 S.W.2d 504, 506–07 (Mo. banc 1993).

**5.** Section 400.1–102(3) states that:
The effect of provisions of this chapter may be varied by agreement, except as otherwise provided in this chapter and except that the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.
§ 400.1–102(3).
All statutory references are to RSMo 1986, unless otherwise noted.

question make specific reference to the "supplier" of the equipment in the financing instrument as being the "vendor."

In view of the foregoing, we will apply Missouri's statutory provisions relating to Article 2 (Sales) in conjunction with our review of Buyer's allegations of trial court error. *See* §§ 400.2–102–.2–725.

■■■ In a court-tried case, such as this, the judgment of the trial court will be affirmed by the appellate court unless there is no substantial evidence to support it, it is against the manifest weight of the evidence, or it erroneously declares or applies the law. *State ex rel. Boston v. Tuckness*, 958 S.W.2d 325, 326 (Mo.App.1998); *see also Iota Mgmt. Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 412 (Mo.App.1987). Furthermore, on review, this court defers to the trial court's ability to draw conclusions where there is conflicting testimony and to weigh the credibility of witnesses, their sincerity, character, and other "trial intangibles" which the record may not reflect. *Panettiere v. Panettiere*, 945 S.W.2d 533, 543 (Mo.App.1997). "On appeal in a court-tried case, an appellate court is concerned with only the correctness of the result, not the route taken by the trial court to reach that result." *Schmidt v. Warner*, 955 S.W.2d 577, 585 (Mo.App.1997). "A correct decision will not be disturbed on appeal merely because the trial court gave a wrong or insufficient reason." *Id.*

For the sake of clarity, we discuss each assignment of trial court error out of the order presented in the parties' briefs.

## I.

In their third point, Sellers allege trial court error in granting Buyer judgment against Sellers for their alleged breaches of express and implied warranties relating to the equipment provided by the two leases. Sellers contend that there was insufficient evidence to support the trial court's judgment on this claim.

Initially, we determine that Sellers have misinterpreted the trial court's judgment in asserting that the trial court found Sellers in breach of an "implied warranty." The trial court entered no such judgment. Therefore, this portion of Sellers' allegation of error is moot and we proceed to a review of the remaining allegations relating to breach of an express warranty arising from both oral and written representations made by Seller Carl Templeton to Buyer regarding the computer system, as represented by the first lease, and the imaging system, as represented by the second lease.

■■■ An express warranty may be created by an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. § 400.2–313(1)(a); *Carpenter v. Chrysler Corp.*, 853 S.W.2d 346, 357 (Mo. App.1993). "[E]xpress warranties are not imposed by state law but rather by the party making the warranty." *Stefl v. Medtronic, Inc.*, 916 S.W.2d 879, 882 (Mo.App.1996). When such a warranty is made, the goods shall conform to the affirmation or promise. *Carpenter*, 853 S.W.2d at 357. It is not necessary for the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee." *Id.* However, an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. *Id.* Indeed, "a seller may exaggerate the quality or value of goods without becoming liable under a theory of breach of express warranty." *Id.* at 358; *see also Guess v. Lorenz*, 612 S.W.2d 831 (Mo.App.1981). "A seller may puff his wares or express his opinion about the quality and value of his goods even to the point of exaggeration without incurring warranty obligation." *Id.* "On the other hand, if the representation is a statement of fact, a petition alleging such a misrepresentation may sufficiently state a claim for breach of express warranty...." *Id.; see also Clark v. Olson*, 726 S.W.2d 718, 719–20 (Mo. banc 1987). "A given representation can be an expression of opinion or a statement of fact depending upon the circumstances surrounding the representation." *Carpenter*, 853 S.W.2d at 358.

■■■ We conclude that Buyer's petition alleged and his evidence supported the proposition that the representations made by Seller Carl Templeton were statements of

fact. Both Buyer and his employee, Ms. Mattox, testified that they informed Seller Carl Templeton that Buyer was searching for a system that would increase the quality and productivity of its typesetting business and that Seller Carl Templeton expressly represented to them that a Birmy 300 Imagesetter was equivalent to a more expensive Linotronic 300 (valued at $70,000.00) and could perform all the functions required by Buyer in conjunction with the computer equipment recommended by Seller Carl Templeton. Then, as heretofore noted, Seller Carl Templeton addressed a letter, dated April 25, 1991, to Buyer, wherein Seller Carl Templeton specifically stated:

> In the event that we (Midwest Office Systems) cannot make the Birmy 300 perform as we represented it, we will pick up the equipment and continue to make your ... lease payments in a timely matter until such time that we can resell the equipment. /s/ Carl Templeton, Vice President.

Admittedly, there was conflicting testimony regarding the actual performance of the Birmy 300 Imagesetter. Seller Carl Templeton testified that the Birmy 300 Imagesetter was properly working and that any malfunctions were caused by poor training and improper use. Buyer's employee, however, testified that the Birmy 300 Imagesetter never performed properly and that they were properly operating it. There was sufficient evidence to support the trial court's findings and judgment that Sellers breached their express warranties made regarding the Birmy 300 Imagesetter, as provided by the second lease.

However, we determine that there was insufficient evidence supporting the trial court's conclusion that Sellers breached their warranty relating to the front end equipment provided by the first lease.

We note that Buyer was initially provided with a Tandon computer to be operated in conjunction with the Birmy 300 imaging system. However, Buyer experienced problems with the Tandon computer and Seller seasonably replaced the Tandon computer with a Macintosh computer system at no cost to Buyer. Thereafter, Buyer experienced few problems with the front end equipment. In-

deed, Buyer continued to use the front end equipment with another imager it rented. In response to the question "if the Birmy had been working correctly, in your opinion, it would have performed the job that Mr. Rauch wanted it to, assuming it had performed correctly?", Buyer's expert witness, Ms. Watwood answered, "[y]es."

The trial court's judgment acknowledged as much when, in its findings of facts, the court stated that "despite repeated efforts by [Buyer] and [Sellers] to correct the situation, said system [the computer equipment and imaging equipment] never performed properly *until a BridgIt setter was leased*" (emphasis added). The clear implication of this finding is that the computer equipment performed properly when coupled with correctly-functioning imaging equipment. Point sustained in part.

## II.

In Sellers' second assignment of error, they aver that the trial court erred in granting a judgment against them based on Sellers' negligent misrepresentation made through its agent Carl Templeton.

In Count II of Buyer's petition, he alleged that Sellers negligently failed to exercise reasonable care and competence in obtaining and communicating information respecting the nature, quality and capacity of both the computer system (first lease) and the imaging system (second lease).

Missouri recognizes a cause of action based on the tort of negligent misrepresentation. *See Hartford Acc. & Indemn. Co. v. Contico Int'l, Inc.*, 901 S.W.2d 210, 212 (Mo. App.1995). The action includes the following elements: (1) that speaker supplied information in the course of his or her business or because of some pecuniary interest; (2) that, due to speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) that speaker intentionally provided information for the guidance of a limited group of persons in a particular business transaction; (4) that listener justifiably relied on the information; and (5) that as a result of

listener's reliance on the statement, he or she suffered a pecuniary loss. *Id.* at 212.

■ As to Sellers' alleged negligent misrepresentations relating to the Birmy 300 imaging system, we review the following colloquy between Sellers' counsel and Buyer's expert witness, Ms. Watwood, during her deposition testimony, which was admitted in evidence at trial:

Q. Did you feel that the Birmy system, if operating properly, was adequate for the task that Mr. Rauch wanted to use it for?

A. If it would have been operating properly, yes.

Q. So that the—given what was represented about the Birmy at that time, in 1991, it could have performed the job that Mr. Rauch wanted, as long it didn't have the problem, whatever problem you believe you identified?

* * *

A. Based on the results—let me back up. Based on the jobs I saw that Mr. Rauch was asking to produce on this unit, based on the results I saw for that unit and off of comparable units, that unit should have been able to have produced that type of work and produced the kind of quality that he was looking for in spot color.

Ms. Watwood determined that there was a mechanical problem with this particular Birmy 300 Imagesetter's hardware that prevented the imager from functioning properly. She further testified that the problem was with the Birmy 300 Imagesetter itself. She stated that "in manufacturing, these pieces have to be very precise, and that when *that one* came off the line ... maybe something was just off, which was creating a misregistration" (emphasis added). Ms. Watwood concluded that the problem "was definitely something hardware, internal to that monitor that was defective."

Ms. Watwood's testimony strongly suggests that the particular Birmy 300 Imagesetter sold to Buyer suffered from some kind of mechanical defect related to the system's hardware. Ms. Watwood unambiguously testified that if the Birmy 300 had properly functioned, it would have adequately "produced that type of work and produced the kind of quality that [Buyer] was looking for in spot color."

■ "A negligent misrepresentation claim is premised upon the theory that the speaker believed the information supplied was correct, but was negligent in so believing." *Colgan v. Washington Realty Co.,* 879 S.W.2d 686, 689 (Mo.App.1994). Here, Buyer's expert testimony shows that Sellers' representations made relative to the Birmy 300 Imagesetter's performance capacity were neither false when made nor were negligent when made. *See id.; Hartford,* 901 S.W.2d at 212. To the contrary, Ms. Watwood's testimony established that Sellers' representations were correct. A properly functioning Birmy 300 imaging system would have satisfied Buyer's printing needs. Under the facts and evidence presented in this matter, Sellers cannot be held culpable for negligent misrepresentation because of the latent defect and malfunction of the Birmy 300 imaging system.

■ Additionally, we need not determine whether Sellers' representations regarding the front end computer system constituted negligent misrepresentation, because, in either event, Buyer suffered little, if any, pecuniary loss, a necessary element of the tort of negligent misrepresentation. *See Hartford,* 901 S.W.2d at 212.

As previously observed, Buyer was initially provided with a Tandon computer to be operated in conjunction with the Birmy 300 Imagesetter but upon experiencing problems with this computer, Seller seasonably replaced the Tandon computer with a Macintosh computer system at no cost to Buyer. Thereafter, Buyer experienced few problems with the front end equipment and used the first lease's equipment with another imager Buyer rented to create the product that Buyer was wanting to output.

We conclude that Buyer has failed to establish all the elements of negligent misrepresentation regarding both the Birmy 300 Imagesetter and the computer system and, therefore, the trial court's judgment relating to Count II of Buyer's petition was not supported by substantial evidence. *See Colgan,* 879 S.W.2d at 691. Point sustained.

**356**

## III.

We now address whether it was error for the trial court to enter judgment against Seller Carl Templeton in his individual capacity for breach of warranty as raised in Sellers' first point.

Seller Carl Templeton maintains that there was no evidence adduced during trial to support Buyer's allegation that he was acting in both his individual capacity and capacity as an agent for Seller Templeton's, Inc. d/b/a/ Midwest Office Systems.

The general rule regarding liability incurred by an agent who signs a contract on behalf of a principal is that the principal is liable, and not the agent, where the principal is disclosed and the capacity in which the agent signs the contract is evident, such as placing "president" or "secretary" after his signature. *Headrick Outdoor, Inc. v. Middendorf,* 907 S.W.2d 297, 300 (Mo.App.1995). The presumption in such cases is that " 'it was the agent's intention to bind his principal and not to incur personal liability, and an agent will not bound personally, except upon clear and explicit evidence of an intention to be bound.' " *Id.*; *see also Budget Rent A Car v. Guaranty Nat'l Ins. Co.,* 939 S.W.2d 412, 415 (Mo.App.1996); *21 West, Inc. v. Meadowgreen Trails, Inc.,* 913 S.W.2d 858, 882 (Mo.App.1995); *Golf Digest/Tennis, Inc. v. Diode, Inc.,* 849 S.W.2d 617, 618 (Mo.App. 1993).

Here, the principal, Seller Templeton's, Inc. d/b/a Midwest Office Systems, was fully disclosed to Buyer by Seller Carl Templeton. Further, Seller Carl Templeton included "vice president" after affixing his signature to the letter relied upon by Buyer for establishing an express warranty as to the Birmy 300 Imagesetter.

Based on our review of the record in this matter, we conclude that Buyer failed to produce clear and explicit evidence to overcome the presumption that Seller Carl Templeton did not intend to be personally bound by any warranties relating to the sale of the Birmy 300. *See Middendorf,* 907 S.W.2d at 300. The record is void of any evidence to the contrary.

We note that an agent, while performing his duties for a principal, is liable for acts or omissions causing injuries to third persons, whenever, under the circumstances he owes a duty of care in regard to such matters to such third persons and he is liable whenever he is culpable of such negligence as would create a liability to another person if no relationship of master and servant or principal and agent existed between him and someone else. *Lee v. Allen,* 120 S.W.2d 172, 175 (Mo.App.1938); *see also State ex rel. Ranni Assoc., Inc. v. Hartenbach,* 742 S.W.2d 134, 139–40 (Mo. banc 1987). However, we have already determined that there was no actionable negligent misrepresentation in this matter. *See* discussion, Part II., *supra.* Point sustained.

## IV.

As to Sellers' remaining points of error, we need not address Sellers' allegations of trial court error relating to the measure of damages arising from alleged acts of negligent misrepresentation by Sellers because we previously determined that Seller Carl Templeton did not engage in any negligent misrepresentation in conjunction with the transaction at hand.[6]

We now address Sellers' remaining point, that the trial court erred in determining what constituted Buyer's damages for the breach of warranties by Sellers.

Sellers aver that the measure of damages for breach of warranty is the difference between the value of a particular good at the time and place of delivery and the value of that good if it had been delivered in the condition as warranted.[7] *See Davis Indus.*

---

6. *See* discussion of measure of damages for negligent misrepresentation in *Frame v. Boatmen's Bank,* 824 S.W.2d 491, 496–97 (Mo.App.1992); *see also* RESTATEMENT (SECOND) OF TORTS § 552 B (1977).

7. By their briefs, Sellers and Buyer each maintain that the provisions of section 400.2–714 define the proper measure of damages in this litigation, as opposed to section 400.2–713 (Buyer's damages for nondelivery or repudiation). We review this point of error solely on the basis of section 400.2–714.

§ 400.2–714 provides as follows:

*Sales, Inc. v. Workman Const. Co., Inc.*, 856 S.W.2d 355, 360 (Mo.App.1993). Sellers suggest that based on that measure, Buyer's damages should not have exceeded $25.000.00. We disagree.

Central to the disagreement between the parties is the fact that the Birmy 300 Imagesetter simply did not operate as warranted. Although there were problems associated with various facets of the front end computer equipment, as represented by the first lease, this equipment when augmented by use of a computer furnished by Sellers, free of additional charge, nevertheless, satisfactorily met Buyer's needs *when joined* with the BridgIt imaging system that Buyer subsequently rented for $11,100.00. Buyer's expert witness testified that the primary problem associated with Buyer's improper output was the Birmy 300 Imagesetter.[8]

The first lease called for Buyer to make lease payments in the total amount of $37,-119.42 and the second lease, involving the Birmy 300 Imagesetter, required payments by Buyer in the total amount of $59,142.66. *See* note 1, *supra*. Buyer refused to make the remaining 45 payments on the first lease ($29,705.85) and 46 payments remaining under the second lease ($48,382.34), plus arrearage relating to payments on the second lease in the amount of $8,522.90.

Buyer eventually settled with General Electric Capital Corporation for the amount of $73,834.00. This settlement was for a sum *less* than the total amount of payments then due under both leases.

Although section 400.2–714(2) authorizes the calculation of damages for breach of warranty in terms of measuring "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted," the sub-section also allows for a different calculation when "special circumstances show proximate damages of a different amount." *See id.* Further, Buyer may recover damages for "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." § 400.2–714(1).

We determine that Buyer's loss constitutes that proportionate amount of the settlement figure with General Electric Capital Corporation attributable to the outstanding payments and arrearage owed on the second lease, totaling $48,508.94.[9]

This figure is in consonance with the express representations made by Sellers that "[i]n the event that we cannot make the Birmy 300 perform as we represented it, we

(1) Where the buyer has accepted goods and given notification (subsection (3) of section 400.2–607) he may recover as damages for any nonconformity of tender the loss resulting in the *ordinary course of events from the seller's* breach as determined in any manner which is reasonable.
(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
(3) In a proper case any incidental and consequential damages under section 400.2–715 may also be recovered.
§ 400.2–714.

8. In addition to Buyer's expert testimony, Ms. Mattox testified that there "were other problems with the front end system, but those were later fixed."

9.

| | | |
|---|---|---|
| (A) | Payments outstanding on the 1st lease: | $29,705.85 |
| | Payments outstanding on 2nd lease, inclusive of arrearage: | $56,905.24 |
| Total | ................................................................ | $86,611.09 |
| (B) | Proportion 1st lease bears to total sum of the two outstanding leases due: $29,705.85 divided by $86,611.09 = 34.30% | |
| | Proportion 2nd lease bears to total sum of the two outstanding leases due: $56,-905.24 divided by $86,611.09 = 65.70% | |
| (C) | Settlement figure Buyer/General Electric: | $73,834.00 |
| | Amount attributable to 1st lease: 34.30% × $73,834.00 = $25,325.06 | |
| | Amount attributable to 2nd lease: 65.70% × $73,834.00 = $48,508.94 | |
| Total | ................................................................ | $73,834.00 |

will pick up the equipment and continue to make your ... lease payments in a timely manner." These damages for breach of warranty in the amount of $48,508.94 have a direct relationship to the installment payments owed by Buyer and we determine that they are therefore reasonable.

As previously noted, the evidence does not support an award to Buyer relating to the breach of warranty of the front end equipment provided by the first lease. We calculate these incorrectly awarded damages as amounting to $25,325.06 ($73,834.00—$48,-508.94 awarded for damages arising from breach of warranty relating to the second lease), and determine that the trial court erred in awarding these damages in the amount of $25,325.06.

 Additionally, we note that Missouri law also permits a buyer to recover incidental and consequential damages proximately caused by the breach. § 400.2–715; *Davis Indus. Sales, Inc.*, 856 S.W.2d at 361; *Groppel Co., Inc. v. United States Gypsum Co.*, 616 S.W.2d 49, 63 (Mo.App.1981); *O'Brien v. Wade*, 540 S.W.2d 603, 605–06 (Mo.App.1976); *Larry Goad & Co. v. Lordstown Rubber Co.*, 560 F.Supp. 583, 588 (E.D.Mo.1983). Incidental damages include, *inter alia*, any reasonable expense incident to the breach.[10] *O'Brien*, 540 S.W.2d at 606. Consequential damages include any loss resulting from general or particular requirements and needs of which a seller at the time of contracting had reason to know and which could not reasonably be prevented. *Id.* The distinction between the two is oft-times blurred.

 We determine that the awards to Buyer of $20,000.00 for Tom Tauch's "Stripping Time" and $21,000.00 for Tammi Mattox's "Extra Typesetting Time" constituted consequential damages. These are damages that Sellers could have reasonably anticipated upon failure of performance of the Birmy 300 imaging system. These labor expenses allowed Buyer to output a finished product as originally contemplated by the parties. *See*

§ 400.2–715(2)(a); *see also General Ins. Co. of America v. Hercules Const. Co.*, 385 F.2d 13, 21 (8th Cir.1967) (in a breach involving the delay of a construction project, the court authorized overtime wages and increased costs caused by additional overhead); *see also* 1 WHITE AND SUMMERS, *supra*, § 10–4, at 568–78.

Under the U.C.C. the parties to a contract may agree to limit remedies for a breach of warranty. *See* §§ 400–2–316, 400–2–718, and 400–2–719. Thus, subject to exceptions not pertinent herein, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." § 400.2–719(3); *Bracey v. Monsanto Co., Inc.*, 823 S.W.2d 946, 949 (Mo. banc 1992)(*subsection (3)* appears to permit the parties to a commercial transaction to agree on the allocation of the risk of failure of the product ... "limitations of damages where the loss is commercial" is not prima facie unconscionable.); *see also Southland Farms v. CIBA–GEIGY Corp.*, 575 So.2d 1077, 1079 (Ala.1991)(the Uniform Commercial Code recognizes the validity of a limitation or exclusion of consequential damages where the loss is commercial); *K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390, 393 (1970).

In the instant matter, we determine that the parties' agreement effectively excluded consequential damages as a remedy available to the Buyer. Further, nothing in the record indicates that either of the parties had an advantage over the other in terms of unequal bargaining power. Nor did the record show that either of the parties negotiated in bad faith. We, therefore, conclude that in the context of this case, the exclusion of consequential damages was not unconscionable. *See County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300, 1308–1309 (S.D.N.Y.1970), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Siemens Credit Corp. v. Marvik Colour, Inc.*, 859 F.Supp. 686, 695 (S.D.N.Y.1994)(there is a presumption of conscionability when the contract is between businessmen in a commercial setting); 1 WHITE AND SUMMERS, *supra*, § 12–11, at 672.

---

**10.** The trial court's judgment did not specify whether Buyer's damages were incidental or

consequential damages.

As heretofore recited, Sellers' letter to Buyer set out that if the Birmy 300 did not perform as represented "we will pick up the equipment and continue to make your . . . lease payments in a timely manner until such time that we can resell the equipment." The remedy available to the Buyer was circumscribed by Sellers' express statement that he would only "pick up the equipment" and "continue to make your . . . lease payments in a timely manner."

We, therefore, determine that the trial court erred in awarding Buyer $21,000.00 for "Tammi Mattox Extra Typesetting Time," and $20,000.00 for "Tom Rauch stripping Time."

▬▬▬ Buyer was also awarded damages of $2,500.00 for a portion of electrical wiring and $11,100.00 for a temporary rental of a BridgIt imaging system to replace the Birmy 300 Imagesetter.

There is sufficient evidence in the record to support an award for incidental damages in the amount of $2,500.00 for electrical wiring. The electrical wiring was put in place by Buyer in a failed attempt to make the Birmy 300 Imagesetter operational.

We determine, however, that the trial court erred when it awarded Buyer damages in the amount of $11,100.00 as compensation for Buyer's rental of a BridgIt imaging system. This is because the trial court has already assessed damages against Sellers relating to the installment payments under the second lease for the Birmy 300 Imagesetter.

If the Birmy 300 imaging system had performed as warranted, Buyer would have had expenses associated with its rental, in either event. Buyer is not entitled to recover as damages the rental cost of an imaging system that constitutes his normal equipment costs. *See Kansas City Bridge Co. v. Kansas City Structural Steel Co.*, 317 S.W.2d 370, 377 (Mo.1958). An award of additional damages for the BridgIt imaging system would constitute a double recovery, i.e., $11,100.00 plus $48,508.94, and would amount to a windfall to Buyer. *See Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo.1970) (the law will not place plaintiff in a better position than he would have been had the contract been completed on both sides).[11] Point sustained in part.

Rule 84.14, Missouri Court Rules (1997) empowers an appellate court to "give such judgment as the court ought to give . . . ." *Black v. Stevens*, 926 S.W.2d 117, 122 (Mo. App.1996). "[T]he facts bearing on the merits of the case were fully developed, and there is no occasion for a new trial, and therefore it remains only to enter the correct judgment." *See Miller–Stauch Const. Co. v. Williams–Bungart Elec., Inc.*, 959 S.W.2d 490, 496 (Mo.App.1998).

That portion of the judgment against Seller Carl Templeton, individually, for negligent misrepresentation and breach of warranty is reversed. That part of the judgment against Seller Templeton's Inc. d/b/a Midwest Office Systems for negligent misrepresentation is, also, reversed. The part of the judgment awarding damages to Buyer against Seller Templeton, Inc., for breach of warranty relating to the Birmy 300 Imagesetter in the sum of $128,434.00 is set aside, and in lieu thereof, Buyer is awarded damages against Seller Templeton, Inc., in the amount of $51,008.94, to bear interest as allowed by law.[12] Costs are assessed against Seller Templeton, Inc. The cause is remanded for entry of a judgment consistent with this opinion.

MONTGOMERY, C.J., and SHRUM, J., concur.

---

**11.** We note that the trial court rejected much of Buyer's other evidence of damages as being "speculative," including its evidence of operating losses of approximately $161,850.00.

**12.** Buyer's damages assessed against Seller Templeton, Inc. d/b/a Midwest Office Systems:

 (1) Breach of warranty (Birmy 300, 2nd lease): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $48,508.94
 (2) Electrical wiring: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 2,500.00
 Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $51,008.94